# UNITED STATES COURT OF APPEALS
## For the Eighth Circuit

_____

**No. 98-1157SD**
**No. 98-1158SD**
**No. 98-1159SD**

_____

United States of America,      *

    *

    Appellee,      *

    *

    v.      *   Appeal from the United States

    *   District Court for the District

Thomas Edward Cordova,     *   of South Dakota.

Frankie Cordova,     *

Harold Leonard Dominguez,     *

    *

    Appellants.      *

_____

Submitted: May 13, 1998
Filed:   October 5, 1998

_____

Before McMILLIAN, MORRIS SHEPPARD ARNOLD, Circuit Judges, and
    LAUGHREY, District Judge.[1]

_____

LAUGHREY, District Judge.

_____

[1]The Honorable Nanette K. Laughrey, United States District Judge for the
Eastern and Western Districts of Missouri, sitting by designation.

These consolidated appeals arise out of the Defendants' convictions for conspiracy to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1). Harold Leonard Dominguez ("Dominguez") challenges the sufficiency of the evidence to support his conviction, the admission of coconspirators' statements, and the quantity of drugs attributed to him at sentencing. Thomas Cordova claims that his motion for change of venue should have been granted and he was denied his right to a speedy trial. Frankie Cordova, Dominguez and Thomas Cordova all claim that they were denied a fair trial because the trial judge and a prospective juror made prejudicial statements during voir dire and the trial judge refused to give the Defendants' theory of defense instructions and restricted the cross-examination of government witnesses. We affirm.

## I.    Background

Viewing the evidence in the light most favorable to the government, the jury could have found the following facts were established at trial. Between 1994 and 1996, Jeff Mousel ("Mousel") traveled from South Dakota to Denver to purchase large quantities of marijuana from Thomas Cordova. Mousel was helped by Toby Ness ("Ness") and Clayton Williamson ("Williamson"). Mousel, Ness and Williamson also purchased cocaine from Frankie Cordova, the nephew of Thomas Cordova. During the two-year time period, the South Dakota men made over 50 trips to Denver and transported more than 300 pounds of marijuana back to South Dakota for sale.

Leonard Dominguez was the supplier of the marijuana that was being sold by Thomas Cordova to the South Dakota men. Thomas Cordova told Ness that his Uncle Leonard was the supplier of the marijuana and on several occasions Mousel, Ness, and Williamson observed Dominguez deliver the marijuana to Thomas Cordova, who then delivered it to the South Dakota men. Dominguez eventually gave his telephone number to Ness, Mousel and Williamson and said they could

contact him directly when they wanted to buy marijuana.  Thomas Cordova knew that Mousel, Ness, and Williamson were from South Dakota and that they were selling the drugs in South Dakota.  Dominguez was also aware of these drug transactions in South Dakota.

## II.     Discussion

### A.     Sufficiency of the Evidence

Dominguez claims that there is insufficient evidence to support his conviction for conspiracy to distribute a controlled substance.  In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the government, resolving evidentiary issues in favor of the government and accepting all reasonable inferences drawn from the evidence that supports the verdict.  *United States v. Erdman*, 953 F.2d 387, 389 (8th Cir. 1992), *cert. denied*, 505 U.S. 1211 (1992).  "A jury's verdict must be upheld if there is an interpretation of the evidence that would allow a reasonable minded juror to conclude guilt beyond a reasonable doubt."  *Id*. at 389.

To establish a drug conspiracy, the government must prove the existence of an agreement between two or more persons to violate federal narcotics law, the defendant's knowledge of the agreement, and the defendant's voluntary participation in the agreement.  *United States v. Hester*, 140 F.3d 753, 760 (8th Cir. 1998); *United States v. Gonzales*, 79 F.3d 413, 423 (5th Cir.), *cert. denied*, __ U.S. __, 117 S. Ct. 183 (1986).  These elements may be established by reasonable inferences from the evidence.  *Henderson v. United States*, 815 F.2d 1189, 1191 (8th Cir. 1987). Dominguez does not contest the existence of a conspiracy to distribute marijuana in South Dakota.  Rather he contends that there was insufficient evidence to show that he knew about or participated in the conspiracy.  He claims that the government's case is based on the fact that he was related to Thomas Cordova, lived

close by, was seen delivering boxes to Thomas Cordova, exchanged pleasantries with the South Dakota men on one occasion, and his phone number was found in their notebook. He asserts that even the jury was uncertain about Dominguez's involvement in the conspiracy because they sent a note to the judge during deliberations which asked: "Did the witnesses testify to any money or drugs being exchanged with Leonard directly or through Thomas in the presence of witnesses?" After a careful review of the lengthy record, we conclude that the government presented sufficient evidence to link Dominguez to the South Dakota conspiracy.

An agreement to join a conspiracy "need not be explicit but may be inferred from the facts and circumstances of the case." *United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992), *cert. denied*, 507 U.S. 922 (1993). "Once the existence of a conspiracy is established, slight evidence connecting a defendant to the conspiracy is sufficient to support a conviction." *United States v. Lomax*, 34 F.3d 1405, 1412 (1994), *cert. denied*, 513 U.S. 1179 (1995). The conspiracy in this case involved an agreement to distribute marijuana in South Dakota. The evidence shows that Thomas Cordova sold over 300 pounds of marijuana to South Dakota residents knowing the marijuana was being distributed in South Dakota. The sales were made at regular and frequent intervals over a two-year period. Between visits, the coconspirators remained in contact by phone to arrange future buys. Telephone records document more than 100 calls between them during the two-year period.

Thomas Cordova said his Uncle Leonard was the supplier of the marijuana and that Thomas Cordova was only the middleman. Dominguez was seen by the South Dakota men on about 50 per cent of the trips to Denver. On one occasion, Ness saw Dominguez pull into the driveway at Thomas Cordova's house and give Thomas Cordova a duffle bag containing marijuana. The bag was then given by Thomas Cordova to Ness. On many other occasions, Ness and Mousel saw Dominguez arrive at Cordova's house with a 12-pack soda box. Dominguez would go into the bedroom with Thomas Cordova and the box. Thomas Cordova would then come out of the

-4-

bedroom and get the money from Ness or Mousel. Thomas Cordova would return to the bedroom, at which point Dominguez exited the bedroom and the home. Thomas Cordova would then come out with the 12-pack soda box and deliver it to Mousel or Ness. The box contained the marijuana which they had just purchased. At other times, Ness saw Thomas Cordova go down the street toward Dominguez's house and then return with marijuana. Williamson once saw Dominguez in the alley with Thomas Cordova and Thomas Cordova returned to the house carrying a box of marijuana. Dominguez and the South Dakota men sometimes conversed and, on at least one occasion, Mousel spoke directly to Dominguez about the quality of the marijuana he was delivering. Eventually Dominguez gave the South Dakota men his telephone number so that they could call him directly for the marijuana. The telephone numbers of both Dominguez and Thomas Cordova were found in one of the coconspirator's notebook.

Given the quantity of drugs and the reoccurring pattern of sales, it is a reasonable inference that Dominguez knew these drugs were for distribution and not personal use. Given his close familial relation with Thomas Cordova and the fact that he was the supplier of marijuana to Thomas Cordova, it is logical to infer that Dominguez knew who was buying the drugs and where they were being taken. The conversations between Dominguez and the South Dakota men and his repeated presence at the drug transactions also creates a reasonable inference that Dominguez knew the purpose of the conspiracy and was a voluntary participant. Frequent contact between the defendants and joint appearances at drug transaction is evidence of an agreement to distribute drugs. *United States v. Esparsen*, 930 F.2d 1461, 1472 (10th Cir. 1991), *cert. denied*, 502 U.S. 1036 (1992); *United States v. Horn*, 946 F.2d 738, 743 (10th Cir. 1991). Being the main supplier of drugs is sufficient to establish knowing participation in the conspiracy to distribute the drugs. *United States v. Romero*, 150 F.3d 821, 825 (8th Cir. 1998). While the jury asked whether there was evidence of money or drugs being exchanged directly between Dominguez and the South Dakota men, the law does not require such an exchange to support a conviction

for conspiracy. Furthermore, after the note, the judge instructed the jury that they must make their own decision based on their recollection of the evidence. Thereafter, the jury convicted Dominguez of conspiracy to distribute a controlled substance.

### B. Restrictions on Testimony of Agent Hanson

Robert Hanson, a Special Agent of the United States Drug Enforcement Administration ("DEA"), conducted the investigation which resulted in the Defendants' arrests. During the trial, the Defendants questioned Agent Hanson about how he conducted his investigation, including things which he did not do. Hanson acknowledged that the government did not subpoena bank records and did not have evidence to show what happened to the profits from the Defendants' drug conspiracy. Hanson also admitted that he did not identify the vehicles owned by the Defendants nor where those cars had been purchased.[2] When defense counsel wanted the Agent to look at his extensive written report to confirm what had not been done in the investigation, the trial court intervened and prohibited further questioning about this. The trial court concluded that such evidence was irrelevant but also held that any relevance was substantially outweighed by the court's concern about undue delay and the possibility of misleading the jury about the issues in the case. The Defendants' claim that this ruling violated their Sixth Amendment right to confront witnesses and present evidence.

A trial judge has broad discretion to determine the permissible scope of testimony and will not be reversed except for a clear abuse of discretion. *United States v. Brown*, 110 F.3d 605, 611 (8th Cir. 1997); *United States v. Cody*, 114 F.3d 772, 776 (8th Cir. 1997). In this case, the judge permitted some questioning about the

---

[2]At trial, there was testimony that Thomas Cordova had told the South Dakota men that the drugs were coming from Mexico in the gas tanks of cars purchased there.

quality of the DEA's investigation, but correctly recognized that an exhaustive exploration of things not done in the investigation would be time-consuming and of little relevance. The real issue at trial was whether the government's witnesses were truthful and whether their testimony was sufficient to convict. Even defense counsel recognized this. In their closing argument, they never referred to what was not done in the DEA investigation, even though they had elicited evidence on this during trial. Instead, they tried to show that the South Dakota witnesses were untrustworthy and that the government's whole case was dependent on their testimony.

Nor is it a Sixth Amendment violation for the judge to place reasonable limits on the defendant's cross-examination of government witnesses. *United States v. Warfield*, 97 F.3d 1014, 1024 (8th Cir. 1996), *cert. denied*, __ U.S. __, 117 S. Ct. 1119 (1997). The district court may impose reasonable limits when the testimony confuses the issue, is repetitive or of only marginal relevance. *United States v. NB*, 59 F.3d 771, 778 (8th Cir. 1995). Here, the trial judge invited any questions that would show the South Dakota witnesses had made inconsistent statements during the investigation and did permit the Defendants to ask some questions about what was not done in the investigation. We find no abuse of discretion. *United States v. Campbell*, 845 F.2d 782, 788 (8th Cir.), *cert. denied*, 488 U.S. 965 (1988) ("absent a clear abuse of discretion and prejudice, we will not reverse a district court's ruling limiting cross examination of a prosecution witness on the basis that it impermissi-bly infringed upon the defendant's right of confrontation.")

### C.    Testimony of Jeff Mousel

Dominguez also claims that his Sixth Amendment right to confront witnesses was violated because the trial judge cut off cross-examination of Mousel, one of the government's key witnesses. Mousel was a coconspirator who implicated Dominguez in the conspiracy. During cross-examination, Mousel claimed that when he went to Denver to purchase drugs, he sometimes saw Dominguez. The attorney

for Dominguez asked Mousel to identify the specific dates when he saw Dominguez and to estimate the amount of drugs delivered on each occasion. Mousel admitted that he did not remember dates and times, but testified that he went to Denver once a month for approximately two years and that he saw Dominguez 50 per cent of the time. At another point on cross-examination, Mousel stated that he had seen Dominguez 24 times during the relevant time period. When defense counsel indicated that he was confused by Mousel's testimony, the trial judge ordered him to move on, noting that the subject was exhausted.

A review of the record reveals that Mousel was cross-examined extensively at trial. His cross-examination was approximately twice as long as his direct examination. He said he didn't remember dates and times, and defense counsel successfully elicited conflicting testimony from Mousel concerning the number of times he had seen Dominguez. Defense counsel had established a basis for attacking Mousel's credibility and his questions became repetitive. It was not an abuse of discretion to limit cross-examination at that point. *Warfield*, 97 F.3d at 1024 (citing *United States v. Willis*, 997 F.2d 407, 415 (8th Cir. 1993), *cert. denied*, 510 U.S. 1050 (1994)).

### D. Voir Dire

The Defendants proposed voir dire questions which explored the issue of racial bias. The trial judge did not use the suggested questions, but instead stated:

> It may appear and it may be established, but whether it is apparent or whether it's established it may be a fact that each of the Defendants are Hispanic citizens. In that regard, I want to question about this matter of race and national origin. This is a court of law. And in a court of law all the members of the jury are judges, judges of the facts from the evidence which has been submitted to them. And just as a court cannot take into consideration race or national origin, if the court is going to be fair, neither should the jury. So those

two doors, I mentioned them before, they open and through those two doors walk many of our citizens, all kinds of citizens: white citizens, black citizens, citizens from Indian country, citizens with an origin from the Spanish speaking countries, from any other country, so I want you to pledge to me that you will treat these defendants with fairness just as you would like to have yourself treated if you were charged with this offense, which means to disregard any inference of guilty or suggestion of guilt by reason of the fact that each of these defendants may either appear to be or may be established to be Hispanic citizens. Would you acknowledge that to me by a raise of your hand? We all have an innate sense of fairness and that innate sense of fairness indicates that no person shall be convicted because of the color of his or her skin or the manner of speech, or the place from where that person comes, or where that person lives. So I ask you to make a pledge that you have made.

According to the Defendants, this statement suggested that being Hispanic created an inference of guilt. Defendants contend that the problem was compounded because the trial judge had difficulty pronouncing Dominguez's surname and the only Hispanic juror on the panel admitted that she had been convicted of possessing cocaine.

The Sixth Amendment requires a trial judge to make inquiry concerning racial bias when racial prejudice might influence a jury. *Ristaino v. Ross*, 424 U.S. 589, 595 (1976); *Rosales-Lopez v. United States*, 451 U.S. 182, 190 (1981). In making this inquiry, the court must balance competing concerns. The court must admonish against racial bias, but must not overemphasize race. As pointed out by the Defendants, the jury panel was overwhelmingly composed of Anglo-Americans. The Defendants, by proposing a voir dire question on racial bias, invited the judge to comment on the issue. The judge's comment confronted the reality that some people may make an inference of guilt based in part on race. He made it clear, however, that such an inference was wrong and that the jurors must treat the Defendants with fairness and must not make any inference of guilt because of their race. Taken as a whole, the judge's inquiry concerning racial bias was not an abuse of discretion and did not deprive the Defendants of a fair trial. *United States v. Eagle Hawk*, 815 F.2d

1213, 1219 (8th Cir. 1987), *cert. denied*, 484 U.S. 1012 (1988) ("[T]he central inquiry is whether the overall jury examination, coupled with the jury charge, adequately protects the defendant from prejudice."); *Rosales-Lopez*, 451 U.S. at 189 (plurality opinion) (It is within the discretion of the trial judge to decide how to probe into the matter of race on voir dire.)

Nor was it error to ask about how to pronounce Dominguez's surname. It is common for a trial judge to ask for help in pronouncing unfamiliar names. Finally, the fact that the only Hispanic juror had a prior drug conviction does not suggest that the jury was tainted by the voir dire process. The judge asked the jurors to pledge that they would not consider the Defendants' race and each did so by an affirmative show of hands.

### E. Jury Instructions

The Defendants contend that the trial court erred by refusing to give the theory of defense instructions submitted by the Defendants. The Defendants' proposed instructions were:

> 1. The defendants contend that they are not guilty of the violation charged because there is no evidence presented beyond a reasonable doubt which establishes any plan or scheme to conspire between the defendant and any of the codefendants or any other person who testified at trial.
>
> 2. The only evidence recovered which could be shown to have been possession with intent to distribute a controlled substance was evidence recovered from other parties not shown to have a personal or business relationship with the defendants.

3. The defendants cannot be held responsible for legal or illegal actions of others with whom they do not know or associate. Mere accusations by police officers who have no prior knowledge or

direct contact with any of the co-conspirators is not sufficient to establish a conspiracy.

4.    Mere proof of a facilitator's effort to put a willing buyer in contact with a willing seller is not sufficient to convict one as a co-conspirator on the charge for which these defendants stand accused.

5.    Mere proof of the existence of a buyer-seller relationship is not enough to convict one as a co-conspirator on the charge for which these defendants stand accused.

A defendant is entitled to a theory of defense instruction if the request is timely made and the proffered instruction is legally supported by the evidence and the law. *United States v. Wiggins*, 104 F.3d 174, 176 (8th Cir. 1997) (citing *United States v. Cabbell*, 35 F.3d 1255, 1259 (8th Cir. 1994)). We find that none of the five instructions submitted by the Defendants satisfy this standard.

The first instruction effectively states that the Defendants don't think the government has presented sufficient evidence to convict them beyond a reasonable doubt. The content of this instruction, however, was addressed more clearly in other instructions approved by the court and given to the jury. Those instructions stated that the burden of proof was beyond a reasonable doubt and that if the government failed to prove each element of the conspiracy beyond a reasonable doubt then the jury must return a not guilty verdict. Because the jury had already been properly advised on the burden of proof and the elements of the crime, it was not error to refuse an instruction that merely advised the jury that the Defendants did not think that the government had met its burden of proof.

As to the second and third instructions, they were properly rejected because they would mislead the jury as to the law. The law does not require evidence of a business or personal relationship between coconspirators. *United States v. Foote*, 898

F.2d 659, 663 (8th Cir.), *cert. denied*, 498 U.S. 838 (1990); *Henderson*, 815 F.2d at 1191. To prove conspiracy, the government need only establish that (1) there was an agreement; (2) between two or more voluntary participants; (3) to violate either expressly or indirectly the controlled substance act. Once a conspiracy is established, a defendant can be held responsible for the actions of a coconspirator even if they do not know the coconspirators and have not directly associated with them. *Romero*, 150 F.3d at 825. A defendant need not even know the full extent of the conspiracy. *Evans*, 970 F.2d 663 at 669.

The last two instructions were properly rejected by the trial court because the evidence at trial did not support them. The trial court correctly held that a buyer/seller instruction based on *United States v. Prieskorn*, 658 F.2d 631, 636 (8th Cir. 1981), is appropriately given in a single transaction case involving small quantities of drugs consistent with personal use. *Hester*, 140 F.3d at 757; *Wiggins*, 104 F.3d at 176. This conspiracy involved large amounts of drugs and significant interaction between the Defendants and the dealers in South Dakota over an extended period of time. Considering the instructions as a whole, the trial judge did not abuse his discretion in rejecting the Defendants' proffered instructions. *United States v. Cunningham*, 83 F.3d 218, 221 (8th Cir. 1996) (A trial court has broad discretion to formulate jury instructions and will not be reversed if the instructions, viewed as a whole, fairly instruct on the law.).

### F.    Venue

Both Dominguez and Thomas Cordova claim that venue was improper in South Dakota and the trial should have been held in Colorado. Neither Defendant, however,

filed a motion for change of venue.[3]  Nor did either Defendant object to venue before, during or at the conclusion of trial.  Any objection they had to venue, therefore, was waived and the question of venue did not need to be addressed by the jury.  *United States v. Dabbs*, 134 F.3d 1071, 1078 (11th Cir. 1998); *United States v. Miller*, 111 F.3d 747, 749 (10th Cir. 1997).  Finally, on the merits, venue was proper in South Dakota because the jury found the Defendants guilty of conspiring to distribute drugs in South Dakota.  "Venue is proper in a conspiracy case in any jurisdiction in which an overt act in furtherance of the conspiracy was committed by any of the conspirators. *United States v. Romero*, 150 F.3d at 824; *United States v. Bascope-Zurita*, 68 F.3d 1057, 1062 (8th Cir. 1995), *cert. denied*, 516 U.S. 1602 (1996); *United States v. Fahnbulleh*, 748 F.2d 473, 476 (8th Cir. 1984), *cert. denied*, 471 U.S. 1139 (1985) (venue proper in Arkansas even though defendants were never there and never intended to distribute drugs in Arkansas where they had joined a conspiracy which did distribute drugs in Arkansas and defendants benefitted from those sales); *also see United States v. Cabrales*, __ U.S. __, 118 S. Ct. 1772, 1776 (1998) (making a distinction between conspiracy and nonconspiracy charges for venue purposes).

### G.    Acts and Statements of Coconspirators

---

[3]The court does not agree with Dominguez's assertion that his motion to dismiss for lack of jurisdiction indirectly raised the issue of venue.  Nor does the court agree with Thomas Cordova's assertion that the question of venue is jurisdictional and therefore, can be raised at anytime.  *United States v. Gaviria*, 116 F.3d 1498, 1517 (D.C. Cir. 1997), *cert. denied*, __ U.S. __, 118 S. Ct. 86 (1998) (citing *United States v. Meade*, 110 F.3d 190, 200 (1st Cir. 1997) ("We have . . . recognized that venue is a waivable personal privilege designed for the benefit of the defendant.  As such, the constitutional and statutory venue provisions are not restrictions on the court's jurisdiction."))

Early during the trial, the government's attorney asked Ness if Mousel had ever identified the person who was supplying Mousel with marijuana. Dominguez's attorney raised a hearsay objection to the question. The trial court responded during

a bench conference, stating that he would conditionally admit all evidence related to the conspiracy and would later make a ruling as to whether there was sufficient evidence of conspiracy to come within the provisions of Federal Rule of Evidence 801(d)(2)(E).

According to Fed. R. Evid. 801(d)(2)(E) a statement is not hearsay if it is made by a coconspirator of a party during the course and furtherance of the conspiracy. To establish the exception, the government must show that (1) a conspiracy existed, (2) the defendant and declarant were part of the conspiracy; and (3) the declaration was made during and in furtherance of the conspiracy. *United States v. Kocher*, 948 F.2d 483, 485 (8th Cir. 1991). The predicate factors must be shown by a preponderance of the evidence and the hearsay statements themselves can be considered to determine whether a conspiracy exists. *Bourjaily v. United States*, 483 U.S. 171, 176 (1987); *United States v. Bell*, 573 F.2d 1040, 1044 (8th Cir. 1978); *United States v. Roulette*, 75 F.3d 418, 424 (8th Cir.), *cert. denied*, __ U.S. __, 117 S. Ct. 147 (1996). In a succinct and cogent statement, the trial court found that each of the predicates had been established by a preponderance of the evidence.

The trial court's conclusion as to the first and second requirements is supported by a preponderance of the evidence. We have already found that there was evidence beyond a reasonable doubt that a conspiracy existed and all three Defendants were participants. As to the third requirement, the only statement to which an objection was raised identified Thomas Cordova as Mousel's source for marijuana. The "in furtherance" language is to be broadly construed and a statement identifying a coconspirator has been held to be in furtherance of the conspiracy. *Kocher*, 948 F.2d at 485. This finding is particularly appropriate here because Ness eventually made direct contact with Thomas Cordova to purchase large quantities of drugs; something he could not have done if he did not know the name and address of Mousel's source. The trial court's admission of Mousel's statement to Ness concerning his source of drugs was not clearly erroneous. *United States v. Eisenberg*, 807 F.2d at 1446, 1453

(8th Cir. 1986) (clearly erroneous standards used to review a district court's admission of a coconspirator's statement).

Dominguez further objects to the admission of evidence which was not related to the conspiracy but did show the coconspirators' "bad acts." For example, there was evidence that Ness and Frankie Cordova had smoked crack together in front of children as young as five years old. None of the evidence was objected to at trial, and some of the character evidence was solicited by Defendants' attorneys in an effort to discredit the government witnesses. Dominguez now contends that this evidence was so prejudicial to him that its admission warrants a reversal. We disagree. The evidence did not relate to Dominguez or the conspiracy so its admission could not be plain error, the applicable standard of review. *United States v. Ferguson*, 776 F.2d 217, 224 (8th Cir. 1985), *cert. denied*, 475 U.S. 1020 (1986) (When character evidence is not objected to, its admission is only reviewable as plain error.). Furthermore, in closing argument, Dominguez's attorney attacked the character of the government's witness to support his argument that they had fabricated the testimony about the three Defendants. He cannot now complain that evidence of the bad character of his coconspirators prejudiced him.

### H.    Speedy Trial

Thomas Cordova contends that the case against him should have been dismissed because the requirements of the Speedy Trial Act, 18 U.S.C. §§ 3161-3174, were not met. The three Defendants were indicted by a grand jury on January 16, 1997. On February 13, 1997, Dominguez and Thomas Cordova made their initial appearance in South Dakota. Frankie Cordova was still at large at this time and did not make his initial appearance in South Dakota until May 21, 1997. A trial date was set for July 29, 1997, 69 days after Frankie Cordova's initial appearance and 166 days

-18-

after Thomas Cordova's initial appearance.[4]  While the Speedy Trial Act generally requires a defendant to be tried within seventy days of his initial appearance, *see* 18 U.S.C. § 3161(c)(1), it provides for a reasonable delay "when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted."  18 U.S.C. § 3161(h)(7); *Henderson v. United States*, 476 U.S. 321, 323 n.2 (1986); *United States v. Patterson*, 140 F.3d 767, 772 (8th Cir. 1998); *United States v. Winfrey*, 900 F.2d 1225 (8th Cir 1990) (the statutory time period does not begin to run until the date the last codefendant makes an initial appearance if the delay is reasonable).  No motion for severance was granted in this case and the delay was reasonable.  Frankie Cordova's whereabouts were not known in February 1997 and when he was arrested he claimed that he was not Frankie Cordova, necessitating an identity hearing.  At the time Thomas Cordova filed his motion to dismiss for failure to timely prosecute, the delay was only 80 days beyond the 70-day limit, well within reason.  *See United States v. Holyfield*, 802 F.2d 846, 848 (6th Cir. 1986), *cert. denied*, 479 U.S. 1090 (1987) (a delay of five months caused by a codefendant's pending motion was not unreasonable).

Thomas Cordova complains, however, that the trial judge failed to make a specific finding on the record that the delay was reasonable.  Instead the trial judge observed that the Defendant had not argued that the delay was unreasonable.  There is no requirement in 18 U.S.C.§ 3161(h)(7), that the trial judge make a finding of

---

[4]In fact, the trial did not occur until September 11, 1997.  On appeal, however, Thomas Cordova does not contest delays in the trial after July 29, 1997.  These delays were caused by a motion for continuance filed by Thomas Cordova, several pre-trial motions filed either by Thomas Cordova or his codefendant, Leonard Dominguez, and a continuance granted to the government.  These delays would all be excluded by the Speedy Trial Act.  18 U.S.C.§ 3161(h)(8)(A) (continuance by any defendant or the government tolls the Speedy Trial clock as to all defendants); 18 U.S.C. § 3161(h)(1)(F); *United States v. Fogarty*, 692 F.2d 542, 546 (8th Cir. 1982), *cert. denied*, 460 U.S. 1040 (1983) (delays resulting from pre-trial motions are excludable as to all defendants).

reasonableness on the record.  *Compare* 18 U.S.C. § 3161(h)(7) *with* 18 U.S.C. § 3161(h)(8)(A).  *See also United States v. Hohn*, 8 F.3d 1301, 1303 (8th Cir. 1993).  The trial court's reference to Thomas Cordova's failure to raise the issue of reasonableness is explained by the rule that the burden is on the defendant to show his right to a speedy trial has been violated.  18 U.S.C. § 3162(a)(2); *United States v. Neal*, 27 F.3d 1035, 1042 (5th Cir. 1994), *cert. denied*, 513 U.S. 1179 (1995) (burden of proof is on the defendant to show his right to dismissal under the Speedy Trial Act).

Given the time periods properly excluded by the Speedy Trial Act, we conclude that Thomas Cordova's trial was timely.

## I.      Relevant Conduct

At sentencing, the trial judge found that Dominguez was responsible for the distribution of between 100 kilograms and 400 kilograms of marijuana.  This finding was based on the evidence at trial and the presentence investigation.  Dominguez claims that this finding is clearly erroneous because there was insufficient evidence to link him to all of the drugs that were sold by Thomas Cordova to the South Dakota men because Dominguez was only observed at one-half of these drug transactions.  We hold that the district court's determination of drug quantity was not clear error.  *United States v. Robles*, 139 F.3d 1187, 1189 (8th Cir. 1998) (a district court's determination of the drug quantities attributable to a defendant for sentencing purposes is reviewed under the clearly erroneous standard); *United States v. Bieri*, 21 F.3d 811, 816-17 (8th Cir. 1994), *cert. denied*, 513 U.S. 878 (1994) .

In cases involving jointly undertaken criminal activity, a defendant is responsible for all "reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."  (U.S.S.G. §1B1.3(a)(1)(A))   A person involved in a drug conspiracy is responsible for all reasonably foreseeable acts of

others that are done in furtherance of the conspiracy. *United States v. Taiul-Hernandez*, 88 F.3d 576, 579 (8th Cir. 1996), *cert. denied*, ___ U.S. ___, 117 S. Ct. 1258 (1997). It is not necessary that the defendant have actually participated in distributing the drugs or "even that he actually knew about the drugs, only that the drug quantities were reasonably foreseeable to him." *United States v. Delpit*, 94 F.3d 1134, 1156 (8th Cir. 1996). To determine what acts are reasonably foreseeably to a defendant, a court may consider a defendant's commitment to the conspiracy and the extent to which he benefitted from the coconspirator's activities. *United States v. Flores*, 73 F.3d 826, 833 (8th Cir.), *cert. denied*, 518 U.S. 1027 (1996); *United States v. Rice*, 49 F.3d 378, 382-83 (8th Cir. 1995). As long as the drug activity involves a common course of conduct, all drug quantities are properly attributed to a defendant for sentencing purposes. *United States v. Spence*, 125 F.3d 1192, 1195 (8th Cir. 1997), *cert. denied*, ___ U.S. ___, 118 S. Ct. 1544 (1998).

The trial court found that Dominguez was a "major player" in a conspiracy to distribute drugs to South Dakota through Mousel and Ness. It is also clear that he attributed to Dominguez the 300 to 350 pounds of marijuana which the South Dakota men bought during the conspiracy. This finding is not clearly erroneous because the record supports a strong inference that Dominguez was the supplier of marijuana to Thomas Cordova who in turn supplied the drugs to Mousel, Ness and Williamson for distribution in South Dakota. Thomas Cordova acknowledged that he was only a middleman and that Dominguez was his supplier. When the South Dakota men arrived in Denver unexpectedly, Thomas Cordova went to Dominguez's house and returned with the drugs or Dominguez arrived at Thomas Cordova's house with the drugs. When prior arrangements had been made, the drugs were already at Thomas Cordova's house.

Given the close family relationship between Thomas Cordova and Dominguez, the proximity of their homes, the similarity in the packaging of the marijuana on those occasions when it was delivered by Dominguez and those occasions when the

marijuana was already at Thomas Cordova's house because prior arrangements had been made for its delivery, Thomas Cordova's statement that Dominguez was his supplier, and Dominguez's statement that the South Dakota men could call him directly to buy marijuana, it is logical to infer that Dominguez supplied all the marijuana which Thomas Cordova sold to the South Dakota men during the conspiracy. *See United States v. Padilla-Pena*, 129 F.3d 457, 468-69 (8th Cir. 1997), *cert. denied*, __ U.S. _ , 118 S. Ct. 1063 (1998).  While testimony concerning the amount of drugs taken to South Dakota was confused in places, considering the totality of the evidence, the trial court's conclusion that Dominguez was responsible for between 300 and 350 pounds of marijuana was clearly supported by the evidence.  Convictions AFFIRMED.

A true copy.

Attest:

CLERK. U.S. COURT OF APPEALS, EIGHTH CIRCUIT.