# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3864

_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Xavier Lightfoot, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: December 14, 2006
Filed: April 26, 2007(Corrected April 27, 2007)

_____

Before WOLLMAN, RILEY, and SHEPHERD, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

This case is once again before us. In 1999, Xavier Lightfoot and Cornelius Peoples were convicted of aiding and abetting the murder of a federal witness, in violation of 18 U.S.C. §§ 1512(a)(1)(A), 1512(a)(1)(C), 1512(a)(2), and 1111. We reversed their convictions and remanded the case for a new trial. United States v. Peoples, 250 F.3d 630, 642 (8th Cir. 2001). Peoples eventually pled guilty to aiding and abetting the murder of a federal witness. Lightfoot proceeded to trial and was convicted of conspiracy to commit a bank robbery, in violation of 18 U.S.C. § 371, conspiracy to murder a federal witness, in violation of 18 U.S.C. §§ 371 and 1111,

and the murder of a federal witness, in violation of 18 U.S.C. §§ 1512(a)(1), 1111, and 2. Lightfoot was convicted on all counts and the district court[1] sentenced him to a term of life in prison. Lightfoot appeals from his convictions, claiming numerous evidentiary errors, error in the jury selection process, a violation of the Speedy Trial Act, and improper questioning by the prosecutor. We affirm.

## I.

Lightfoot and Peoples perpetrated several robberies in the fall of 1997. In December 1997, Lightfoot was arrested and charged with one of these robberies (a federally insured credit union in Omaha, Nebraska). While he was being held in a pretrial detention facility, Lightfoot learned that his lover and housemate, Jovan Ross,[2] had supplied information to law enforcement about the robbery. Lightfoot subsequently informed Peoples (who had not yet been charged with participation in the robberies) that he wanted a witness against him murdered.[3] Lightfoot suggested that if this witness was not killed, Lightfoot might try to arrange some sort of deal with law enforcement, which Peoples believed would entail Lightfoot's "snitching" on Peoples. Lightfoot provided Peoples with identifying information about Ross, including her address and the kind of car she drove. Peoples contacted Anthony Hunter about murdering Ross. Hunter declined to commit the murder himself. Instead, he spoke with Curtis Barfield and Carl Haskell about killing Ross. It was eventually agreed that Haskell would kill Ross. Hunter and Barfield provided Haskell

---

[1]The Honorable Fernando J. Gaitan, Jr., now Chief Judge, United States District Court for the Western District of Missouri.

[2]Although Ross was biologically male, she considered herself and presented herself to others as a woman. Accordingly, we will use feminine pronouns when referring to Ross.

[3]Lightfoot did not provide Peoples with the witness's name.

with a car and Hunter gave him a firearm. Peoples testified that Lightfoot was responsible for paying these individuals.

On June 8, 1998, Haskell shot Ross to death. Lightfoot, still incarcerated pending trial for robbery, was anxious for verification that the murder had in fact occurred. When Peoples confirmed that Ross had been murdered, Lightfoot reacted by saying "beautiful" five times and expressed his gratitude to Peoples, saying, "[t]hat's perfect, that's perfect, I can't ask for no more."

As noted above, Lightfoot and Peoples were convicted of aiding and abetting Ross's murder. After we reversed the convictions, Barfield and Haskell (who had been previously indicted for their involvement in the murder), were joined with Peoples and Lightfoot under a single superseding indictment. Barfield and Haskell were later severed from the case and Peoples pled guilty. At the second trial, Peoples was the government's principal witness. Among other things, Peoples deciphered recordings of telephone conversations between Lightfoot and Peoples in which the two men, aware that their conversations were being recorded, spoke in an indirect, veiled manner. Other witnesses at trial included Hunter and an individual named Larry Platt, who had participated in a robbery with Lightfoot and Peoples. Lightfoot testified on his own behalf and denied that he had wanted Peoples to kill Ross. He stated that Ross's murder was all Peoples's doing and that Lightfoot had wanted Ross to be bribed so that she would leave town.

## II.

Lightfoot argues first that the district court improperly restricted his cross-examination of government witnesses and erroneously precluded him from introducing important evidence. We disagree.

The Confrontation Clause guarantees defendants the opportunity to effectively cross-examine adverse witnesses. United States v. Triplett, 104 F.3d 1074, 1079 (8th Cir. 1997) (citing United States v. Willis, 997 F.2d 407, 415 (8th Cir. 1993)). The "exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." Davis v. Alaska, 415 U.S. 308, 316-17 (1974). A defendant's Confrontation Clause rights are not boundless, however, and "trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).[4] "We will not reverse a trial court's decision to limit cross-examination absent a 'clear abuse of discretion and a showing of prejudice to [the] defendant.'" United States v. Purkey, 428 F.3d 738, 753 (8th Cir. 2005) (alteration in original) (quoting United States v. Love, 329 F.3d 981, 984 (8th Cir. 2003)), *cert. denied*, 127 S. Ct. 433 (2006). "A key factor in determining whether a defendant's right of confrontation has been violated is whether the defendant had other means at his disposal to obtain the effect that the excluded examination would have allegedly established." United States v. Warfield, 97 F.3d 1014, 1024 (8th Cir. 1996).

Because Lightfoot's principal evidentiary contention is that the district court improperly impaired his ability to challenge the motivations and credibility of

---

[4]In support of his claims, Lightfoot reposes great reliance upon Holmes v. South Carolina, 547 U.S. 319, 126 S. Ct. 1727 (2006), which Lightfoot argues supports a defendant's right to present evidence of third-party guilt. Lightfoot's reliance on Holmes is misplaced, however, because Holmes addressed an "arbitrary" rule of evidence that unduly impinged upon the defendant's ability to present evidence of third-party guilt. 126 S. Ct. at 1735. The evidence at issue here, by contrast, was (as set forth below) excludable pursuant to "well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Id. at 1732 (citations omitted).

Peoples, Hunter, and Platt, we note at the outset that the jury was given a great deal of information bearing on these witnesses' reasons for cooperating with the government and their credibility. The jury learned that Peoples was a gang-affiliated criminal with a prior felony conviction for aggravated battery. Peoples acknowledged that he had lied to law enforcement about the robberies. Peoples also stated that he had reached a plea agreement with the government, that he had not wanted to risk the death penalty for his involvement in Ross's murder, and that he was hoping for a sentencing reduction for his cooperation in the case. As for Hunter, he stated that he had a prior conviction for aggravated robbery and testified that he had been an "enforcer" in a street gang. Hunter also acknowledged that he had pled guilty to aiding and abetting Ross's murder pursuant to a plea agreement and that he had received a sentencing reduction. The jury heard Platt testify that he had prior convictions and that he had been involved in a number of crimes. Platt stated that he had entered into a plea agreement with the government, pursuant to which he pled guilty to transporting stolen property across state lines and agreed to testify against others. Platt acknowledged that he hoped for a sentencing benefit in the case. He also stated that he had cooperated against codefendants in another case, after which he received probation. Platt also acknowledged that he had repeatedly lied to law enforcement about what he knew about the bank robberies and that he had falsely denied knowing anything about Ross's murder. It is in light of the foregoing factual background that we examine Lightfoot's contention that he was unduly circumscribed in examining Peoples, Hunter, and Platt.

A.     Exclusion of Evidence Pertaining to a Telephone Call from Michelle Peoples to Lightfoot

The district court precluded Lightfoot from questioning Peoples about a telephone call that Peoples's wife, Michelle, placed to Lightfoot prior to trial while Lightfoot was in jail. Lightfoot argues that this call – which was made at Peoples's behest – was relevant because, *inter alia*, it exposed Peoples's motivation in testifying

and reveals Peoples's attempts to influence Lightfoot.  Lightfoot also argues that "[t]he conversation is significant because Peoples's statements, made through his wife, are lies."  We conclude that these arguments lack merit.

First, even assuming that Michelle's statements can be attributed to Peoples, it is not clear that Lightfoot offered Peoples's motivation for cooperating with the government as a ground for cross-examining Peoples about the telephone call. Instead, Lightfoot stated that the calls were relevant to show that Peoples was a "schemer" and that he sought to exert some kind of influence over Lightfoot:

> COUNSEL: I think I need to show that this guy is a schemer and that he's not just a forthcoming good citizen, and I think him putting his wife up –
> THE COURT:  Scheming about what?
> COUNSEL: There are lies in the phone call that he had – as I have just been reminded, there are attempts by Michelle on behalf of [Peoples] to influence Mr. Lightfoot, which he resists, but I think it shows –
> THE COURT: Influence him to do what?
> COUNSEL: It's hard to tell.
> THE COURT: Well, I'm going to deny that.  Objection sustained.

In any case, even if the district court should have understood from this exchange that Lightfoot was seeking to elicit evidence concerning Peoples's motivation in testifying, it is difficult to see how evidence that Peoples sought to influence Lightfoot in some vague, unexplained manner would have contributed to or differed from the other testimony regarding Peoples's motivations.  Peoples admitted that he hoped for a sentencing reduction and acknowledged a concern that he might be otherwise at risk for the death penalty.  He also stated that he was suspicious of Lightfoot and that he thought that Lightfoot might implicate him.  In light of this testimony, evidence of some indistinct, undefined effort to influence Lightfoot would have likely done little to alter the jury's appraisal of Peoples's motivations.

We also reject Lightfoot's claim that the telephone call was relevant to show that Peoples was attempting to influence Lightfoot. Although we have previously held that one witness's attempts to influence another witness's testimony may, in some cases, bear on the credibility of both, United States v. O'Conner, 64 F.3d 355, 359-60 (8th Cir. 1995) (per curiam), Peoples does not appear to have been attempting to influence Lightfoot's testimony during the telephone call. Indeed, as Lightfoot's vague offer of proof implicitly reflects, it is difficult to say that Peoples was attempting to influence Lightfoot to do anything at all.

Also unavailing is Lightfoot's assertion that he should have been able to question Peoples about the telephone call because Michelle was telling Lightfoot lies. Rule 608(b) of the Federal Rules of Evidence confers upon district courts discretion to permit witness-credibility questioning on specific bad acts not resulting in a felony conviction. United States v. Martz, 964 F.2d 787, 789 (8th Cir. 1992). We will assume for the sake of argument that Michelle's alleged lies are prior bad acts that were admissible pursuant to Rule 608(b). There was no error in the exclusion of this evidence, however, because Lightfoot was unable to elicit any probative testimony on this topic when he questioned Peoples outside the presence of the jury. Peoples acknowledged that he had asked his wife to call Lightfoot, but denied that he had asked her to lie to him.[5] Accordingly, even if the district court had permitted Lightfoot to question Peoples about the phone call, there is no indication that Lightfoot would have elicited any evidence that Peoples (through his wife) had lied.[6]

---

[5]It bears mention that Lightfoot was obliged to "take" this answer. Rule 608(b) "forbids the use of extrinsic evidence to prove that the specific bad acts occurred." Martz, 964 F.2d at 789 (citing Fed. R. Evid. 608(b)). A party attempting to impeach a witness by questioning him about bad acts bearing on credibility is required to "take his answer." Id. (citations omitted).

[6]Lightfoot also contends that the district court should have allowed him to question Peoples about the many calls Peoples had placed to Michelle from jail, as well as about Michelle's costly phone bills. Both the calls and Michelle's telephone

## B. Exclusion of Testimony Concerning the Wyandotte County Homicide

Lightfoot contends also that the district court erred by precluding him from questioning Peoples and Hunter about their involvement in an unrelated double homicide in Wyandotte County, Kansas.[7] Neither Peoples nor Hunter has been charged in the double homicide, and the murders evidently remain unsolved. Peoples told law enforcement that the murders had been committed by Hunter and that he had helped Hunter dispose of the bodies and the weapon. According to what appears to be a police detective's hand-written notes (of uncertain authorship), Hunter claimed that it was Peoples and another individual who had committed the murders. Hunter's recorded witness statement, however, does not accuse Peoples of the murders. The district court concluded that the probative value of any inquiry on the murders would have been outweighed by its potential for undue prejudice and jury confusion. We agree.

Lightfoot's claimed purpose in seeking to explore the uncharged double homicide was to demonstrate that Hunter's and Peoples's cooperation in this case was motivated by a hope for leniency – not just in this case, but in the Wyandotte County case as well. Although Lightfoot alludes to unspoken understandings between the government and the witnesses, the record reflects no agreements that Peoples or Hunter would receive any leniency for the Wyandotte County murders, and neither plea agreement contains provisions immunizing Peoples or Hunter from state or local

bills are, as far as we can discern, completely irrelevant and thus not a proper subject for cross-examination. We also reject the contention that Michelle's failure to respond to Lightfoot's accusation that Peoples lied to law enforcement constituted an admission on Peoples's part that Lightfoot's accusations were accurate.

[7]Most of the information pertaining to this claim was conveyed through exhibits that were not admitted into evidence.

prosecution. When Peoples was questioned about the murders outside the presence of the jury, he stated that he had not been charged in the double homicide and that he had never been asked to provide testimony about Hunter's involvement. Lightfoot did not ask Peoples about any deals or understandings he may have had with the government about these murders. Nor did Lightfoot pursue an offer of proof with regard to Hunter that would indicate what Hunter's testimony might have been in this regard. Accordingly, Lightfoot's contention that cooperation in this case was a "two-for-one deal" that garnered the witnesses leniency in both the Ross and Wyandotte County murders is mere speculation.[8]

Because Lightfoot was able to establish Hunter's and Peoples's hopes for leniency as their motivation for testifying in this case through other means, the district court did not abuse its discretion in precluding examination regarding collateral and uncharged prior bad acts and speculative, unspoken agreements between the government and the witnesses. See Purkey, 428 F.3d at 753-54 (holding that there was no error in preventing a defendant from attempting to demonstrate that a witness's testimony was motivated by a desire to avoid punishment for uncharged acts where the defendant was able to demonstrate that the witness sought a reduction in his sentence on charged conduct); United States v. Rodriguez-Andrade, 62 F.3d 948, 953 (7th Cir. 1995) ("It is not an abuse of discretion to exclude speculative evidence of government promises where there is already ample evidence of genuine plea bargains and government benefits.").

---

[8]Lightfoot finds it significant that Peoples's assistance in the investigation of the Wyandotte County murders helped provide a basis for a motion filed by the government pursuant to Rule 35 to reduce Peoples's sentence in the Ross murder case. The sentencing benefit may have encouraged Peoples to cooperate in the Wyandotte County investigation, but it has no apparent bearing on Peoples's reasons for testifying in this case.

Lightfoot also sought to explore whether Hunter and Peoples were complying with the requirement in their plea agreements that they disclose any information that they might have about state, local, or federal criminal activity. Lightfoot argues that because Peoples and Hunter told mutually inconsistent stories, either or both of them must have been lying about the double homicide, in violation of their plea agreements, and that the jury should have been made aware of this deceit. As noted earlier, however, Lightfoot did not pursue an offer of proof with regard to Hunter's testimony, and it is therefore not clear what Lightfoot would have been able to accomplish had he examined Hunter on this matter. Moreover, because Hunter's statements to the police concerning the homicides predated his plea agreement in this case, it is questionable whether lies he may have told about the homicides would be probative of his compliance with the plea agreement in the Ross homicide case. Although Lightfoot asked Peoples about his involvement in the homicides, he did not ask Peoples whether he had spoken truthfully about the Wyandotte County murders and did not question him about Hunter's statement.[9]

In sum, because there is little indication that an examination of Peoples or Hunter on the Wyandotte County double homicides would have yielded anything fruitful for the defense and the potential for undue prejudice and jury confusion was substantial, the district court did not abuse its discretion in precluding Lightfoot from pursuing this line of inquiry.[10]

---

[9]Evidence that Peoples or Hunter had attempted to "frame" the other was potentially relevant. Johnson v. Brewer, 521 F.2d 556 (8th Cir. 1975). In Johnson, however, if the evidence conveyed in the defendant's offer of proof had been admitted into evidence and credited by the jury, it would have demonstrated that the witness had previously framed an individual in an earlier case. Id. at 560-64. In this case, by contrast, the offer of proof did not so clearly indicate that either Peoples or Hunter had attempted to frame the other.

[10]At trial, Lightfoot also suggested that Hunter could be questioned about his statements to police about the murders because he denied on cross-examination that

C.    Exclusion of Evidence of Peoples's Juvenile Conviction for Involuntary Manslaughter

Lightfoot contends next that he should have been allowed to question Peoples about Peoples's juvenile conviction for involuntary manslaughter. Lightfoot argues that this conviction – which would have served as an aggravating factor for the death penalty had Peoples proceeded to trial and been found guilty – contributed to Peoples's decision to plead guilty and testify against Lightfoot. We conclude that the district court did not abuse its discretion in precluding Lightfoot from exploring this topic. Lightfoot was able to elicit testimony that Peoples did not want to risk the death penalty. It is unlikely that the jury would have had an appreciably different view of Peoples's reasons for cooperating with the government had Lightfoot been able to question Peoples about a juvenile involuntary manslaughter conviction.

D.    Excluded Evidence Pertaining to a Home Invasion Perpetrated by Peoples, Platt, and Others

Lightfoot also sought to introduce evidence pertaining to a home invasion perpetrated by Peoples, Platt, and others. Lightfoot contends that evidence of the home invasion was admissible to show that Platt was testifying falsely when he stated that he received a lenient sentence on that offense merely for pleading guilty and that the sentence simply "fell in the grid." This argument lacks merit, as Platt acknowledged several times at trial that he had received probation after cooperating with law enforcement. Lightfoot also suggests that testimony concerning the home

_____

he had talked with law enforcement about crimes other than those at issue in this case. Assuming, *arguendo*, that this is an accurate characterization of Hunter's testimony (the exchange between Lightfoot's counsel and Hunter on this matter is somewhat opaque), it was not an abuse of discretion to preclude further examination on this collateral topic.

invasion would be relevant to show that Platt was a "repeat deal maker" who knew the value of cooperating with authorities. Lightfoot was able to question Platt about this subject, however, and it is unlikely that testimony concerning the details of the home invasion would have been of any significant probative value in Lightfoot's case.

In addition, Lightfoot suggests that he should have been able to introduce evidence concerning the home invasion to rebut the government's attempt to paint Lightfoot as, in Lightfoot's words, a "criminal mastermind who turned [Peoples and Platt] from relatively small-time nighttime burglars into dangerous armed robbers who brandished firearms." The jury heard other evidence of Platt's and Peoples's violent backgrounds, some of which was related to the home invasion. For example, Platt admitted that he been charged with three counts of aggravated assault, two counts of burglary, one count of kidnaping, and two counts of attempted robbery in relation to the home invasion. The jury also heard Peoples admit that he spent time in prison for aggravated battery and that he had owned a firearm prior to meeting Lightfoot. Accordingly, the district court did not abuse its discretion in precluding Lightfoot from developing testimony regarding the details of the home invasion.

### E. Preclusion of Evidence of Ross's and Lightfoot's HIV Status

Finally, Lightfoot argues that he was improperly precluded from testifying that both he and Ross were HIV positive. At trial, Lightfoot argued that their HIV status was relevant because it explained why he committed the robberies, namely, to make money before both he and Ross were incapacitated by illness. Lightfoot was permitted to testify that he had an unspecified health problem that placed pressure on him to make money. He also testified that he felt the need to help take care of his son and Ross. Insofar as Lightfoot's reasons for committing the robberies were relevant

to his defense, restricting him to testifying that he had an unspecified health condition did not prejudice his case.[11]

### III.

Lightfoot contends next that his conviction must be reversed because the district court improperly excused for cause two venirepersons based on their written questionnaires. This claim is unavailing.

"[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Witherspoon v. Illinois, 391 U.S. 510, 522 (1968). If even one venirperson is improperly excluded for cause, the death penalty cannot be imposed. Kinder v. Bowersox, 272 F.3d 532, 543 (8th Cir. 2001) (citing Gray v. Mississippi, 481 U.S. 648, 667-68 (1987)). A venireperson may be properly excluded from sitting in a capital case, however, if the venireperson's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424 (1985). "We review a district court's removal of death-scrupled venirepersons for an abuse of discretion," even where the removal is based on the venirepersons' responses to written questionnaires rather than a face to face voir dire. Purkey, 428 F.3d at 750.

---

[11]Lightfoot's contention that evidence of Ross's HIV status was relevant to explain why Lightfoot thought that Ross would be likely to accept a bribe to leave town does not appear to have been presented to the district court and thus will not be considered on appeal. See United Fire and Cas. Co. v. Historic Pres. Trust, 265 F.3d 722, 728 (8th Cir. 2001) (observing that a claim of error in the exclusion of evidence cannot be predicated on a ground that was not presented to the district court at trial).

We need not reach the merits of Lightfoot's <u>Witherspoon</u> claim, because <u>Witherspoon</u> error does not require the reversal of a conviction, but only that the death sentence be vacated. See <u>Gray</u>, 481 U.S. at 668 (reversing judgment for <u>Witherspoon</u> error "insofar as it imposes the death sentence"); <u>Bumper v. North Carolina</u>, 391 U.S. 543, 545 (1968) ("Our decision in <u>Witherspoon</u> does not govern the present case, because here the jury recommended a sentence of life imprisonment."). Because Lightfoot was not sentenced to death, the remedy for <u>Witherspoon</u> error is not applicable to this case. In any event, we have reviewed the challenged venirepersons' questionnaires and are satisfied that the district court did not abuse its discretion in excusing them.

## IV.

We turn next to Lightfoot's speedy trial claim. Lightfoot contends that because his 70-day speedy trial clock starting running on June 13, 2001, the date of the mandate in the prior appeal, the government was required to try him by August 22, 2001, which was well before his trial date and before any continuances had been requested or granted. Lightfoot does not appear to raise any claim regarding delays that may have occurred subsequent to August 22, 2001. The district court rejected Lightfoot's speedy trial claim because it determined that when Barfield and Haskell were joined with Lightfoot and Peoples in a superseding indictment on August 9, 2001, Lightfoot's speedy trial clock was reset and a new clock began to run. In arriving at this conclusion, the district court relied upon the following language from the Second Circuit: "[I]n cases involving multiple defendants only one speedy trial clock, beginning on the date of the commencement of the speedy trial clock of the most recently added defendant, need be calculated under 18 U.S.C. § 3161(h)(7)." <u>United States v. Piteo</u>, 726 F.2d 50, 52 (2d Cir. 1983).

Lightfoot argues that because Barfield and Haskell had been indicted well before their joinder with Lightfoot and Peoples, it was Lightfoot and Peoples (rather

-14-

than Barfield and Haskell) who were the most recently added codefendants. Accordingly, Lightfoot contends that joinder with Barfield and Haskell did not reset his speedy trial clock.

The Speedy Trial Act provides in pertinent part that

[i]f the defendant is to be tried again following an appeal or a collateral attack, the trial shall commence within seventy days from the date the action occasioning the retrial becomes final . . . The periods of delay enumerated in section 3161(h) are excluded in computing the time limitations specified in this section.

18 U.S.C. § 3161(e). This 70-day time limit begins to run upon the district court's receipt of our mandate. United States v. Lozano, 413 F.3d 879, 882 (8th Cir. 2005). The delays enumerated in section 3161(h) include "reasonable period[s] of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." 18 U.S.C. § 3161(h)(7). Pursuant to section 3161(h)(7), we have held that when a newly indicted or arraigned defendant is joined with a defendant whose speedy trial clock has already started running, the latter defendant's speedy trial clock will be reset so that it reflects the speedy trial clock of the newly added codefendant. See, e.g., United States v. Patterson, 140 F.3d 767, 772 (8th Cir. 1998) ("Where multiple defendants are joined for trial and no motion for severance has been granted, the statutory time period does not begin to run until the last codefendant has been indicted or arraigned."). Thereafter, all of the defendants are subject to one controlling speedy trial clock and any time periods excluded from the speedy trial calculations for one defendant will be applicable to the other defendants. Id.

This approach comports with the purpose of section 3161(h)(7), which is to "insure that the Speedy Trial Act does not alter the present rules governing severance of co-defendants by forcing the government to prosecute the defendants separately or

be subject to a speedy trial dismissal motion." United States v. Monroe, 833 F.2d 95, 100 (6th Cir. 1987); see also United States v. Vega Molina, 407 F.3d 511, 532 (1st Cir. 2005) (noting that the purpose of section 3161(h)(7) is to"prevent the Speedy Trial Act from becoming a sword that can be used to shred the joinder rules"), *cert. denied sub nom.* Zuniga-Bruno v. United States, 126 S. Ct. 296 (2005). Synchronizing all of the defendants' speedy trial clocks so that they reflect the speedy trial clock of a newly added co-defendant prevents speedy trial concerns from deterring the government from seeking to join defendants.

When all of the defendants intended to be joined have speedy trial clocks that have already started running, we look to see which of the defendants has the most time remaining. Cf. United States v. Barnes, 251 F.3d 251, 257 (1st Cir. 2001) (citing Henderson v. United States, 476 U.S. 321, 323 n.2 (1986)) ("The Supreme Court has interpreted this proviso to mean that when a joint trial is in prospect, the speedy trial clock seeks the longest available span of time."); Committee on the Administration of the Criminal Law of the Judicial Conference of the United States, Guidelines to the Administration of the Speedy Trial Act of 1974, as amended, 106 F.R.D. 271, 298 (1984) ("In effect, the latest deadline for any of the joined defendants becomes the deadline for all."). In other words, once multiple defendants with time remaining on their respective speedy trial clocks have been joined together, and if severance has not been granted, their speedy trial clocks will, subject to section 3161(h)(7)'s reasonableness requirement, be reset and synchronized with the clock of the defendant with the most time remaining. This insures that speedy trial considerations will not hamper the joinder of defendants who have different amounts of time left on their respective speedy trial clocks.

In light of the foregoing, the section 3161(h)(7) analysis in this case should not turn on which group of defendants was most recently added. Instead, the pertinent question is which defendant (or defendants) had the most speedy trial time remaining. The government appears to contend that the joinder of defendants under a single

indictment not only synchronizes the defendants' respective speedy trial clocks, but automatically resets all of the clocks to zero. We acknowledge that this is the practical result in those cases where a defendant whose speedy trial clock has not yet commenced is joined with a defendant whose speedy trial clock had already started running. For the defendant whose clock has not yet commenced running, of course, the speedy trial clocks starts at zero days elapsed. The other defendant's clock, for all practical purposes, may be considered reset to zero because it will be synchronized to the speedy trial clock of the codefendant.

By contrast, when defendants, all of whose speedy trial clocks have already commenced, are joined together, it is doubtful whether section 3161(h)(7) envisions automatically resetting all of the speedy trial clocks to zero. One could imagine, for example, a case where two defendants with very little speedy trial time remaining were joined together. Resetting these defendants' speedy trial clocks to zero would arguably result in a significant speedy trial windfall for the government because the government would be placed in a more advantageous speedy trial position than it would been in without the joinder. It is one thing for section 3161(h)(7) to remove speedy trial obstacles to joinder; it is quite another for it to be used to make joinder affirmatively advantageous to the government, a result that might run afoul of section 3161(h)(7)'s reasonableness requirement.

We need not resolve this issue, however, because Lightfoot has failed to meet his burden under the Speedy Trial Act under any reasonable interpretation of section 3161(h)(7). Cf. United States v. Cordova, 157 F.3d 587, 599 (8th Cir. 1998) (citing 18 U.S.C. 3162(a)(2) and United States v. Neal, 27 F.3d 1035, 1042 (5th Cir. 1994)) (the "burden is on the defendant to show that his right to a speedy trial has been violated"). Lightfoot's speedy trial motion mentions neither Barfield nor Haskell and offers no analysis regarding how their inclusion in the case may have affected the running of Lightfoot's speedy trial clock. Moreover, the time between the issuance of the superseding indictment on August 9, 2001, and Lightfoot's October 2001,

-17-

initial appearance on this indictment was excludable.  See <u>United States v. Van Someren</u>, 118 F.3d 1214, 1219 (8th Cir. 1997) (holding that the period of time between a superseding indictment and arraignment on that indictment is excludable). Accordingly, Lightfoot's speedy trial clock would have expired no earlier than October 2001.

V.

We have considered and find to be without merit Lightfoot's contention that the government improperly cross-examined him regarding his intention to go to trial on the robbery charges.

The judgment is affirmed.

_____