# United States Court of Appeals
## For the First Circuit

No. 11-2239

UNITED STATES OF AMERICA,

Appellee,

v.

LYNETTE MARYEA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph N. Laplante, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Boudin,[*] Circuit Judges.

W. Daniel Deane, with whom Nixon Peabody LLP, was on brief for appellant.
Seth R. Aframe, Assistant United States Attorney, with whom John P. Kacavas, United States Attorney, was on brief for appellee.

January 15, 2013

---

[*] Judge Boudin heard oral argument in this matter and participated in the semble, but he did not participate in the issuance of the panel's opinion. The remaining two panelists have issued the opinion pursuant to 28 U.S.C. § 46(d).

TORRUELLA, **Circuit Judge**.  Defendant-Appellant Lynette Maryea ("Maryea" or "Defendant") was charged with one count of conspiracy to possess with intent to distribute and to unlawfully distribute Oxycodone, Oxycontin, Suboxone, Lorazepam and Ativan in violation of 21 U.S.C. §§ 841(a)(1) and 846.  On August 18, 2010, a jury found Maryea guilty on that count.  She now appeals her conviction on various grounds.  Maryea first challenges the district court's denial of her Speedy Trial Act, 18 U.S.C. § 3161, claims in her motion to dismiss on the basis that the exclusion of time for her co-defendant's continuance was unreasonable as to her. Maryea also asserts that the district court's failure to order a mental competency evaluation after she sustained an injury during trial was an abuse of discretion.  Finally, she argues that the government's evidence at trial established a prejudicial variance from the charges listed in the superseding indictment against her. After careful consideration, we affirm in all respects.

## I.  Background

### A.  Factual Background

Maryea was originally charged with fourteen co-defendants for their collective involvement in a scheme to unlawfully procure, smuggle into and distribute narcotic controlled substances within the Rockingham County House of Corrections ("RCHOC") in Brentwood, New Hampshire.  Since Maryea's appeal follows a conviction, the facts associated with that scheme are recounted "in the light most

-2-

favorable to the verdict." United States v. Poulin, 631 F.3d 17, 18 (1st Cir. 2011).

In March 2009, Richard Woods ("Woods") -- Maryea's co-defendant in the original indictment and the only remaining co-defendant with Maryea in the superseding indictment -- began his incarceration at RCHOC. Woods and his girlfriend, Noreen Durham ("Durham"), both suffered from opiate addictions, and Durham was prescribed Suboxone, an opiate blocker that assists with withdrawal symptoms. Following his incarceration, Woods regularly asked Durham to procure Suboxone for him. Durham testified to having made three deliveries of Suboxone to RCHOC for Woods through a delivery scheme involving placing Suboxone and tobacco into a baggie, putting the baggie inside a Dunkin' Donuts coffee cup, and dropping the coffee cup in a pre-designated trash can in front of a nursing home approximately 100 yards from the jail. The nursing home contained a laundry room where designated inmates ("trustees") were employed. In July 2009, Durham informed Woods in recorded phone conversations that she would not make any further deliveries of Suboxone outside the nursing home for fear of getting caught and violating her probation for a conviction unrelated to this scheme.

Troy Muder ("Muder") -- another co-defendant in the original indictment and Maryea's boyfriend -- had been committed at RCHOC to serve a six-month sentence, and became Woods' cellblock mate on July 8, 2009. Shortly after his incarceration at RCHOC,

Maryea made an unsuccessful attempt to smuggle painkillers into RCHOC by dropping pills off in a dump truck parked on the premises of the jail near the nursing home. However, in early July 2009, Maryea reunited with a former acquaintance, Justin Knowles ("Knowles"), who knew Muder and had recently been released from RCHOC. Knowles advised Maryea of a "better way" to smuggle drugs into the jail, namely, by packaging drugs -- tobacco, Oxycodone, Oxycontin, Xanax, and other pills -- into "slugs," or containers made from the tip of a latex glove, and dropping off the slugs with the "trustees" working in the laundry department in the nursing home.

Maryea largely procured the drugs included in the slugs by filling fraudulent prescriptions at various pharmacies after stealing blank prescription pads with Knowles and Kerry Noonan ("Noonan"), another co-conspirator. Maryea also created a prescription template on her computer to generate false prescriptions for obtaining the narcotics. Once the drugs were procured, Maryea, Knowles and others would package them into slugs and drive them to the RCHOC facility; Knowles would deliver them to co-conspirator trustees in the laundry department at the nursing home. Between July and September 2009, six such deliveries were accomplished into RCHOC. Muder would receive the slugs once they were delivered to the trustees and smuggled inside the jail, and he

would use the pills and tobacco for his own consumption or as currency for bartering within the jail.

On August 14, 2009, after Durham informed Woods that she would no longer be making Suboxone deliveries, Woods instructed her in a recorded phone conversation to call Maryea, tell her that he, Woods, "owe[s] her boy" Muder, and deliver the Suboxone to Maryea. Maryea would then, in turn, accomplish the Suboxone delivery to RCHOC. Durham delivered Suboxone pills to Maryea three times in August 2009, and on one occasion, when delivering the pills to Maryea's home, she met Knowles.

On September 20, 2009, Noonan and Knowles were arrested after Noonan drove Knowles to RCHOC and Knowles entered the laundry room of the nursing home. Upon their arrest, a slug was seized from Knowles containing fifteen 15-milligram Oxycodone pills, three 30-milligram Oxycodone pills, twelve Suboxone pills, and sixteen Xanax pills. A pill bottle was also seized from Noonan's purse which contained five 30-milligram Oxycodone pills.

B. Indictments and Pre-Trial Motion Practice

On December 16, 2009, a federal grand jury returned an indictment against Maryea and fourteen other individuals for conspiring to possess with intent to distribute and to unlawfully distribute Oxycodone, Oxycontin, Suboxone, Lorazepam, and Ativan from July 2009 to September 20, 2009, in violation of 21 U.S.C. §§ 841(a)(1) and 846 ("Original Indictment"). Following her

indictment and detention, Maryea filed motions for release and for release on conditions, indicating that she suffered from bipolar disorder and that she had a "significant medical history which requires medical treatment for pain." During hearings on these motions, Maryea repeatedly complained about back and neck pain that she claimed was not being addressed by jail officials, and it was also adduced that Maryea had spent time in a state psychiatric hospital for her bipolar disorder.

On July 16, 2010, Woods filed a motion to continue ("Woods' First MTC"), and Maryea objected, providing speedy trial calculations. The district court granted Woods' motion after Maryea's counsel "expressly informed the court that Maryea does not request or desire severance of her case." In August 2010, a grand jury returned a superseding indictment ("Superseding Indictment") charging only defendants Maryea and Woods with the same conspiracy as in the Original Indictment, but stating that the conspiracy began in April 2009 instead of July 2009.

During Maryea's arraignment on the Superseding Indictment, the government moved the district court to order a mental health evaluation at a federal medical facility to assess her competency to stand trial. Maryea objected to the government's motion as she had already procured her own mental health evaluation, and the examining physician had concluded that she was

competent to stand trial.  The district court denied the government's motion for the reasons stated in Maryea's objection.

On September 1, 2010, Woods filed his second motion to continue ("Woods' Second MTC"), requesting a delay in his trial date due to: (1) a companion state matter pending in the Rockingham County Superior Court with a trial scheduled for October 6, 2010, the outcome of which could affect Woods' plea negotiations in the federal criminal matter; and (2) Woods' continuing plea negotiations with the government.  The district court granted the continuance on the day it was filed without obtaining Maryea's objection or consent, concluding that "the ends of justice served by granting a continuance outweigh the best interest of the public and the defendant in a speedy trial, 18 U.S.C. § 3161(h)(7)(B)(iv), for the reasons set forth in the motion."  Trial was rescheduled for January 4, 2011.

Maryea filed a series of motions in late August and early September 2010, including, inter alia, two motions to dismiss the Superseding Indictment for violations of the Speedy Trial Act, a motion to remove counsel and appoint new counsel, and a motion for bail alleging the Bureau of Prisons' failure to properly provide medical care.[1]  In her September 20, 2010 Reply Brief to her motion

---

[1]  Although represented by counsel, Maryea filed these motions pro se.  Apparently resolving her disagreements with her defense counsel, said counsel resumed representation of Maryea throughout the pre-trial motion practice discussed infra.

to dismiss, Maryea objected to the granting of the continuance. Relying on the co-defendant exclusion in the Speedy Trial Act, 18 U.S.C. § 3161(h)(6) ("Co-Defendant Clause"), Maryea argued that extending her trial date merely on the basis of co-defendant Woods' motion to continue was unreasonable:

> It is simply submitted that the Court cannot find the delay caused by Woods' . . . motion[] to continue to be reasonable as to Maryea. . . . This is because the Court was no longer dealing with more than two co-defendants and one of the defendants was simply looking for more time to resolve companion state cases.

The district court convened a hearing to address Maryea's objection, where the district court judge stated to Maryea that the court was:

> fairly aggravated that you're advancing these arguments that contradict the positions you've taken already in the case, because I've asked you repeatedly every time we've talked about speedy trial if you wanted a severance, and you've stressed to me every single time you do not want a severance. Let me ask you this. Do you want to go to trial in this case next week? Is that what you want to do? Because I'm ready to try the case whenever you are.

In response, Maryea's counsel stated that,

> [I]n terms of trial strategy, . . . I want Mr. Woods sitting on one of these chairs along with everybody else, and that's the truth. And that's a simply [sic] legal analysis, factual analysis . . . trial analysis that I do . . . I'm not looking for severance. I am objecting to the motion to continue.

The district court judge then asked defense counsel, "But given that the law says when you don't agree, you have to choose trial

strategy; right?  Do you prefer to be sitting there next to Woods, or do you prefer your speedy trial?  Because that's what the statute says," and defense counsel responded, "I don't think the statute says that because I don't move to sever, that I've forfeited my speedy trial claim."

Evaluating the strategic choices expressed by Maryea in choosing not to sever her trial from Woods alongside Woods' need for a delay, the district court denied Maryea's Speedy Trial objection, extending Woods' and Maryea's trial date.  In doing so, the court stated, "what's reasonable for one may not be reasonable for another, and that's what's wrong.  That's what (h)(6) [the Co-Defendant Clause] seems to allow for.  The fact that when you have a group, you have people with different interests, different strategies, different tactics, and there's been no severance, the clock has to be the same for everyone."  Maryea filed a supplemental motion to dismiss on Speedy Trial Act grounds, but that motion was denied at trial for the same reasons stated in the district court's earlier order.

Before trial commenced, the district court sua sponte ordered that Maryea undergo "a medical and psychological evaluation to determine her competency to stand trial, including an assessment of whether, and the extent to which her physical pain impacts that competency."  On November 10, 2010, the court-appointed doctor submitted his report, concluding that Maryea was competent to stand

-9-

trial.  The report confirmed that Maryea was "able to answer all . . . questions" during the doctor's evaluation and that she "reported that she uses the law library [to] work on her defense." After recognizing Maryea's "ongoing pain symptoms," the doctor observed that said symptoms "did not impair the cognitive process during the evaluation," and that it would be "a very unusual circumstance that, with an individual's mental disorder under reasonable control, the mere presence of pain would make them not competent to stand trial."  The report thus concluded that Maryea's pain complaints did not affect her competency.

## C.  Maryea's Trial

On December 30, 2010, Woods entered a plea agreement which the court accepted.  Maryea's trial then commenced on January 4, 2011. After the fourth day of trial, Maryea was injured in a car accident while being transported from the courthouse to the jail.  She moved to continue the trial and filed a motion for a mistrial, which was later withdrawn.  The district court granted the continuance and held two subsequent status conferences to consider Maryea's complaints of pain and her treatment in the prison.  The district court also ordered an independent medical evaluation to (1) evaluate and diagnose any injuries Maryea may have sustained in the car accident; and (2) determine whether the "continuing effects of those injuries, if any, will prevent her from meaningfully participating in the ongoing criminal trial and

-10-

assisting in her defense, including observing the evidence and communicating with her counsel." Following an examination, the examining doctor concluded that Maryea had suffered a pinched nerve in her neck, and the district court ordered that an MRI be performed on her neck based on the report's recommendation. In a series of hearings following the accident, the district court monitored Maryea's status and, following the withdrawal of Maryea's oral motion for a mistrial, scheduled the trial to reconvene on January 24, 2011.

Upon the recommencement of her trial, Maryea said that she was experiencing "breakthrough pain," although she also told the district court that the pain was "not impairing [her] ability to pay attention or to sit here as of right now." The court notified her that if her pain reached a point "where it interferes with your ability to participate meaningfully in your defense and consult with counsel and the like, I'm sure you're going to let us know." Maryea confirmed that she would.

On January 25, 2011, defense counsel informed the court that Maryea was "crying" and "hysterical" after not receiving her medication prior to being transported to the courthouse. According to defense counsel, when he asked her to discuss witness strategy, she said, "I don't care. . . . [d]o whatever you want, I can't do this anymore." On this basis, counsel informed the court that he could not "effectively communicate" with his client. The court

ordered a recess to allow Maryea's medication to take effect, and then held a status conference on the issue of Maryea's competency. Defense counsel stated at that conference that he had "reservations" regarding Maryea's competency, and the court engaged in a colloquy with Maryea in which she stated on the record that her mood was "stable," that she could assist her counsel, and that she wished to "forge [ahead] with this trial." When the district judge asked her if she understood what he was saying, she responded, "Absolutely. I can understand. I'm coherent. I can comprehend." After noting that Maryea had been previously found competent to stand trial, had been assisting and continued to assist her lawyer with her defense, and appeared capable of "having a conversation" with the court, the district judge stated that she was "quite clearly an adult intelligent person who is able to understand me and able to make me understand her." As such, the district judge concluded that she fit "the definition of a competent defendant" and accordingly allowed the trial to continue.

Evidence closed on January 27, 2011, and Maryea filed a Federal Rule of Criminal Procedure 29 motion for a judgment of acquittal, arguing that the government's evidence proved two distinct conspiracies rather than one overarching conspiracy, and that the government had not produced sufficient evidence linking her to the conspiracy charged in the Superseding Indictment. The district court denied Maryea's motion, stating that, when "viewing

-12-

the evidence in a light most favorable to the prosecution . . . , it seems to me that . . . the jury certainly could infer that . . . the conspirators who did tie this entire course of conduct together, even if it does amount to more than one conspiracy if broken down, into a single conspiracy, was Lynette Maryea and Troy Muder.  So for the reasons . . . stated by the U.S. Attorney in his objection, I have to deny the motion for Rule 29."

The district court charged the jury, and the jury sent a note to the court during its deliberations asking, "Which indictment are we supposed to refer to?  Jury instructions are unclear."  The court instructed the jury to deliberate and return a verdict on the Superseding Indictment.  The jury then returned a guilty verdict, and the district court entered judgment on October 19, 2011.  This timely appeal followed.

## II.  Discussion

Maryea argues that the district court erred by (1) denying her Speedy Trial Act claims in her motion to dismiss; (2) failing to order a second mental health evaluation of her competency to stand trial following her car accident; and (3) denying her Rule 29 motion based on a prejudicial variance between the conspiracy proven at trial and that charged in the Superseding Indictment.  We address each issue in turn.

-13-

## A. Maryea's Challenges on Appeal

### 1. Speedy Trial Act Claims

This court "review[s] the district court's denial of a motion to dismiss based upon the Speedy Trial Act de novo as to legal rulings and for clear error as to factual findings." United States v. Maxwell, 351 F.3d 35, 37 (1st Cir. 2003). The Speedy Trial Act requires that a court grant a defendant's motion to dismiss for lack of a speedy trial if the defendant is not brought to trial within seventy non-excludable days. 18 U.S.C. §§ 3161(c)(h), 3162(a).

Under the Speedy Trial Act, "[i]n any case in which a plea of not guilty is entered, the trial of a defendant charged in an . . . indictment . . . shall commence within seventy days from the filing date . . . of the . . . indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). Section 3161 designates periods of time that may be properly excluded in computing time on the Speedy Trial clock, including the two exclusions at issue here: the "Co-Defendant Clause" and the "Ends-of-Justice Clause." Under the Co-Defendant Clause, "[a] reasonable period of delay when the defendant is joined for trial with a co-defendant as to whom the time for trial has not run and no motion for severance has been granted" is excludable from the seventy-day clock between the filing of an

-14-

indictment and the commencement of trial. 18 U.S.C. § 3161(h)(6). This provision "stops the [Speedy Trial] clock for one defendant in the same manner and for the same amount of time as for all co-defendants." United States v. Rush, 738 F.2d 497, 504 (1st Cir. 1984) (quoting United States v. Campbell, 706 F.2d 1138, 1141 (1st Cir. 1983) (alteration in original)). The Act also permits the exclusion of days resulting from the granting of a continuance, "if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A).

Between Maryea's appearance and trial, 383 days elapsed. Maryea concedes that, of those days, 204 days are excludable under the Speedy Trial Act. Maryea also assumes, without conceding, that for the purposes of appeal: (1) 36 days are excludable under the First MTC granted to Woods; and (2) 30 of the 58 total days for the court-ordered competency evaluation are excludable. Therefore, 113 days remain between the filing of the Superseding Indictment and the commencement of Maryea's trial, and Maryea limits her challenge in this appeal to those sixty days within that period "erroneously held to be excludable by the district court based on" that court's granting of Woods' Second MTC.

Maryea makes two interrelated arguments in her challenge to the district court's exclusion of the above-referenced sixty

days.  First, she contends that the court erred in not assessing the reasonableness of the application of the Second MTC as to her Speedy Trial clock.  Second, she asserts that the court erred by requiring severance from her co-defendant as a pre-condition for analyzing the reasonableness of the continuance as it applied to her.  We address each argument separately.

### a.    Application of a Reasonableness Requirement to the Co-Defendant Clause

Maryea claims that the district court erred in failing to consider "the reasonableness, vel non, of the delay [resulting from the granting of the Second MTC] as it applied to [her] situation." She first argues that the Supreme Court's decision in Bloate v. United States, 130 S. Ct. 1345, 1349 (2010), supports reading a reasonableness requirement into the Co-Defendant Clause because, in that decision, the Supreme Court suggested that the subsections of § 3161 may need to be analyzed together before properly excluding a period of delay.  Specifically, Maryea contends that, since the Supreme Court read the ends-of-justice requirement under subsection (h)(7) into subsection (h)(1), a subsection that allows exclusions for procedural delays or delays resulting from ongoing motion practice and interlocutory appeals, subsection (h)(7) and its reasonableness requirement must also be read into the Co-Defendant Clause, subsection (h)(6).  Second, Maryea claims that there is no First Circuit precedent directly on point regarding the application of the reasonableness requirement to the Co-Defendant Clause.

-16-

While the issue was raised in United States v. Brown, 736 F.2d 807 (1st Cir. 1984), the Court did not reach it due to the fact that the defendant in that case had not articulated an argument for why the excluded time was not reasonable as to him.  Finally, Maryea relies on Third and Ninth Circuit law which has upheld the proposition that, when a delay granted for one defendant in a multi-defendant trial is applied to a co-defendant's Speedy Trial clock under the Co-Defendant Clause, a court must assess the reasonableness of the delay not only as to the first defendant, but also as to any co-defendant.  See United States v. Lewis, 611 F.3d 1172, 1176 (9th Cir. 2010); United States v. Novak, 715 F.2d 810, 816, 821 (3d Cir. 1983), abrogated in part by Henderson v. United States, 476 U.S. 321, 330 (1986).

Maryea maintains that Woods' Second MTC was not reasonable as to her since the continuance only gave him more time to achieve his plea deal with the government, undermining her defense strategy and resulting in her being stranded as the "lone defendant to be tried for a conspiracy that originally named fifteen co-defendants."  She likens her case to that of United States v. Hall, 181 F.3d 1057, 1062 (9th Cir. 1999), in which the Ninth Circuit held that a defendant suffered prejudice under the Speedy Trial Act when the district court granted a continuance to the government for the "primary purpose" of allowing the only other co-defendant in the case to "pursue plea negotiations."

The government contends that the district court did not err when it excluded from Maryea's Speedy Trial clock the period resulting from the grant of the Second MTC following its determination that Woods was entitled to a continuance due to ongoing plea negotiations and a pending state court matter. That is because the only way that the court could honor Woods' need for a continuance and Maryea's right to a speedy trial was to grant Maryea a severance so that she could be tried ahead of Woods. Since the district court expressly afforded Maryea the option of a severance and she expressly declined to file a motion to sever due to her trial strategy to be tried alongside Woods, the district court's extension of the delay to Maryea was reasonable as the only way to secure Woods' interest and allow the defendant to pursue her strategy. The government cites to the Tenth Circuit's recent decision in United States v. James, 418 Fed. Appx. 751, 754 (10th Cir. 2011), to support its proposition that a "[d]efendant cannot have the benefit of his trial strategy and then argue that the delay resulting from that strategy was unreasonable."

When a Speedy Trial Act violation is alleged by a defendant, a trial court follows a two-step process. United States v. Staula, 80 F.3d 596, 600 (1st Cir. 1996). First, it calculates and determines the aggregate time elapsed awaiting trial. Id. In this case, the parties do not challenge the district court's Speedy Trial calculations with respect to the aggregate time elapsed

-18-

between the Superseding Indictment and Maryea's trial. Second, the Court determines how many days are properly excluded from that ultimate sum. Id. Maryea does not contest the reasonableness of the ends-of-justice determination in Woods' Second MTC as to him, nor does she contest the validity of the Co-Defendant Clause as a general matter. Rather, Maryea asks the court to impose an additional requirement in assessing whether days excluded from her co-defendant's Speedy Trial clock should be excluded from the ultimate sum of her own Speedy Trial clock--namely, a requirement that the district court find reasonable as to her days excluded from her co-defendant's Speedy Trial clock if they are to count as excludable days from her own Speedy Trial clock.

Maryea is correct that the case law in this Circuit has not addressed head on whether the Co-Defendant Clause as a general matter is subject to a reasonableness limitation,[2] and we decline to do so here. However, the court agrees with the government that,

---

[2] Maryea specifically refers to this Court's decision in United States v. Brown, 736 F.2d 807. In that case, defendant Brown asked the court to follow the Third Circuit's decision in United States v. Novak by recognizing a reasonableness limitation on the application of excludable time from one co-defendant to another. Id. at 809 (citing Novak, 715 F.2d at 814). This court held that, since Brown did not provide any specific reasons for why the excludable period of delay might be reasonable as applied to his co-defendant but not as applied to him, the Court "need not interpret the precise interplay of sections (h)(1)(F) and (h)(7) of the Act." Id. In United States v. Mitchell,723 F.2d 1040, 1048 (1st Cir. 1983), we noted a circuit split on the application of a reasonableness requirement to the Co-Defendant Clause, but explicitly declined to resolve the conflict in the circuits due to defendant Mitchell's failure to file a motion for severance.

under the facts of this particular case, the district court did not err when it denied Maryea's motion to dismiss. In line with the principles outlined in the Supreme Court's decision in <u>Bloate</u> as well as the reasoning of our sister circuits, the Court will assume without deciding, for the purposes of this case, that a reasonableness requirement applies, and that the requirement may be met through a factors-based assessment. <u>See</u> <u>Bloate</u>, 130 S. Ct. 1345 (holding that time excluded from a Speedy Trial clock for pretrial motion preparation is not automatically excluded under § 3161(h)(1), but may only be excluded when a court makes appropriate reasonableness findings under § 3161(h)(7)); <u>United States</u> v. <u>Lewis</u>, 611 F.3d 1172, 1176 & n. 2 (9th Cir. 2010) (affirming Ninth Circuit precedent that, "in order to attribute a co-defendant's excludable delay under § 3161(h)(7) to a defendant, the delay must meet the reasonableness requirement of § 3161(h)(6)," and noting that the reasonableness requirement "comports with Supreme Court precedent"); <u>United States</u> v. <u>Stephens</u>, 489 F.3d 647, 655 (5th Cir. 2007) ("Attribution of the excludable delay of one co-defendant to another co-defendant is not, however, automatic; rather the period of delay must be reasonable") (citing <u>Henderson</u> v. <u>United States</u>, 476 U.S. 321, 326-27 (1986); <u>United States</u> v. <u>Cordova</u>, 157 F.3d 587, 599 (8th Cir. 1998) (applying reasonableness requirement to and finding reasonable an 80-day delay in co-defendant's trial resulting from another co-defendant's capture and

identity hearing); United States v. Howard, 918 F.2d 329, 336 (2d Cir. 1990) (holding that the Co-Defendant Clause exclusion requires a defendant to make a motion for severance in order to benefit from the reasonableness limitation); United States v. Mayes, 917 F.2d 457, 460 (10th Cir. 1990) (applying reasonableness requirement to Co-Defendant Clause); United States v. Culpepper, 898 F.2d 65, 67 (6th Cir. 1990) (same); United States v. Tobin, 840 F.2d 867, 869-70 (11th Cir. 1988) (same); United States v. Dennis, 737 F.2d 617, 621 (7th Cir. 1984) (same); United States v. Novak, 715 F.3d 810 (3d Cir. 1983) (same).

In considering the significance of a defendant's failure to petition for severance in assessing reasonableness, it is important to be clear about the language and stated purpose of the Co-Defendant Clause itself, which allows for exclusions of a "reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." 18 U.S.C. § 3161(h)(6) (emphasis added). Some circuits have interpreted that provision as requiring a defendant to file a motion for severance in order to challenge the reasonableness of the delay on appeal. See United States v. Howard, 443 Fed. Appx. 596, 598 (2d Cir. 2011) (citing Vasquez, 918 F.2d at 336-37); Culpepper, 898 F.2d at 67. It is uncertain that this circuit has imposed such a requirement. See United States v. Mitchell, 723 F.2d 1040, 1048 (1st Cir. 1983). In

-21-

any event, we consider the failure to move to sever an important consideration given that our sister circuits have found a petition for severance relevant in their reasonableness analysis, having either found that a failure to move for severance contributes to a finding that a defendant was not prejudiced by a delay granted to a co-defendant or that, under a totality-of-the-circumstances test, a defendant's failure to move to sever is an important factor to consider.  See United States v. Messer, 197 F.3d 330, 336-38 (9th Cir. 1999) (applying a totality-of-the-circumstances test in determining reasonableness of applying delay to a co-defendant and listing a defendant's failure to move to sever as a factor to consider); Cordova, 157 F.3d at 599-600 (finding delay reasonable where no motion for severance was granted and explaining that a defendant fails to meet his burden in showing that his right to a speedy trial has been violated when he fails to argue that the delay was unreasonable); Franklin, 148 F.3d at 457-58 (stating that "[a] defendant's failure to move for severance, or otherwise pursue a speedy trial in the district court, can undermine prejudice allegations made on appeal"); Mayes, 917 F.2d at 460 (finding no Speedy Trial Act violation when considering as a factor the defendant's failure to ask to be tried separately from a co-defendant); Tobin, 840 F.2d at 869-70 (noting that defendant's failure to move to sever his case from a co-defendant's was a factor supporting the reasonableness of a delay); Dennis, 737 F.2d

at 621-22 (finding the delay reasonable where defendant "at no time moved to sever his case and had failed to allege any substantial prejudice resulting from the delay").

To the extent that Maryea alleges prejudice or unreasonableness under the totality of the circumstances resulting from her co-defendant having reached a plea agreement with the government as a result of ongoing negotiations prior to trial -- made possible, at least in part, by the continuances granted by the district court -- we cannot agree that such a delay goes against the text, legislative history, and purpose of the Speedy Trial Act. This is because the "utility of a joint trial [wa]s particularly compelling here, as the defendants were charged with a single conspiracy so that the government could be expected to 'recite a single factual history, put on a single array of evidence, and call a single group of witnesses.'" Franklin, 148 F.3d at 457. In a case heavily relied on by Maryea, the Third Circuit stated that "[t]he Legislative history of section 3161(h)(7) illustrates a strong congressional preference for joint trials and an intention that delays resulting from the joinder of codefendants be liberally excluded." See Novak, 715 F.2d at 814. Courts have accordingly selected formulas that promote joint trials under the particular facts of the case based on the stated intent of the Senate in its 1974 and 1979 Senate Reports that the Co-Defendant Clause was intended to help avoid "the time, expense and inconvenience of

-23-

separate prosecutions." See id. at 815; United States v. Campbell, 706 F.2d 1138, 1141-42 (11th Cir. 1983); S. Rep. No. 1021, 93d Cong., 1st Sess. 38 (1974); S. Rep. No. 212, 96th Cong., 1st Sess. 24 (1979). Further, Maryea could have avoided any prejudice resulting from ongoing plea negotiations by seeking severance, and she has made no showing that the granting of the Second MTC resulted in Woods reaching the plea agreement which allegedly prejudiced her, or that she would not have been convicted of the conspiracy had Woods joined her trial. For all of these reasons, we find the application of the delay resulting from the Second MTC to Maryea's Speedy Trial clock to be reasonable.

Maryea's second Speedy Trial Act argument is that the district court erred in requiring her to either request a severance or forfeit her Speedy Trial rights. This is because, Maryea claims, Speedy Trial Act rights may not be waived by a co-defendant's failure to request a severance based on the Supreme Court's decision in Zedner v. United States, 547 U.S. 489 (2006), the rule of a majority of sister circuits, and the text, legislative history, and purpose of the Act. See Mitchell, 723 F.2d at 1047.

In Zedner, the Supreme Court held that, since the Speedy Trial Act was designed not only to protect defendants but also the public interest, defense continuance requests could not be based merely on a defendant's waiver of his rights under the Act. Id. at

-24-

501.  Rather, the granting of a continuance must "fit within one of the specific exclusions set out in subsection (h)."  Id. at 500. To the extent the consideration of a failure to seek a severance in a factor-based reasonableness determination might be considered a "waiver," it does not constitute a prospective waiver of Speedy Trial Act rights of the kind at issue in Zedner.  Firstly, Zedner involved a blanket prospective waiver "for all time" of a defendant's rights under the Speedy Trial Act; this case does not. See Zedner, 547 U.S. at 492-93.  Such a broad waiver was deemed ineffective by the Supreme Court because it found that the breadth of the waiver by definition did not "fit within one of the specific exclusions set out in subsection (h)."  Id. at 500.  In the facts before us, the exclusion fits within the Co-Defendant Clause, and we have found the application of the exclusion as to Maryea reasonable.  The Supreme Court in Zedner also found the prospective nature of the waiver ineffective, distinguishing it from retrospective waivers and stating that "there is no reason to think that Congress wanted to treat prospective and retrospective waivers similarly."  Id. at 502.  Retrospective waivers, the Court reasoned, do

> not pose a comparable danger because the prosecution and the court cannot know until the trial actually starts or the guilty plea is actually entered whether the defendant will forego moving to dismiss.  As a consequence, the prosecution and the court retain a strong incentive to make sure that the trial begins on time.

-25-

_Id._  The "waiver" at issue in this case is not a prospective waiver but is better characterized as retrospective since Maryea could either assert her right to a speedy trial by moving to sever or challenge an alleged denial of her Speedy Trial Act rights following the denial of a motion to sever based on unreasonableness.  Maryea still remained in control of the 70-day clock as to her since she was not precluded from accelerating the clock or challenging exclusions from her clock even if she may not -- and should not -- have control of the 70-day clock as to her co-defendant.  Thus, merely placing conditions on her assertion of her Speedy Trial Act rights does not constitute an ineffective prospective waiver "for all time" as prohibited under _Zedner_.

To conclude, we hold that the district court did not err in denying Maryea's motion to dismiss for lack of a speedy trial since the delay caused by Woods' Second MTC was reasonable.  The court thus affirms the district court's finding that no Speedy Trial violation occurred since, applying the properly excluded days from Woods' Second MTC, Maryea's Speedy Trial clock did not run in excess of the requisite seventy days.

## 2. **Mental Competency Determinations**

The competency standard for standing trial involves an inquiry into whether a defendant has "a rational as well as factual understanding of the proceedings against" him or her, and whether the defendant "has sufficient present ability to consult his lawyer

with a reasonable degree of rational understanding."  Indiana v. Edwards, 554 U.S. 164, 170 (2008) (citing Drope v. Missouri, 420 U.S. 162, 171 (1975); Dusky v. United States, 362 U.S. 402, 402 (1960)).  Pursuant to 18 U.S.C. § 4241, a district court "shall order . . . a hearing [to determine the mental competency of the defendant] if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  18 U.S.C. § 4241(a); see also United States v. Brown, 669 F.3d 10, 17 (1st Cir. 2012) ("A district court must sua sponte order a competency hearing if there is reasonable cause to believe that a defendant is mentally incompetent.").  Courts are required "to hold a competency hearing sua sponte whenever evidence raises a sufficient doubt as to the competence of the accused."  Johnson v. Norton, 249 F.3d 20, 26 (1st Cir. 2001).  Factors to consider in guiding a district judge's inquiry into whether an evidentiary hearing as to competence is warranted include "a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial."  Id. at 27 (quoting Drope, 420 U.S. at 180).  A district court may consider its own interactions with the defendant in determining whether there is reasonable cause for an examination or an evidentiary hearing.  United States v. Curtis, 520 F.2d 1300,

1304 (1st Cir. 1975). Even if a district court has found a defendant competent when the trial begins, "a significant change in circumstances in the midst of trial may render a second competency hearing proper." Yehboah-Sefah v. Ficco, 556 F.3d 53, 82 (1st Cir. 2009). The conviction of a person legally incompetent to stand trial violates due process. See Johnson, 249 F.3d at 26.

The court reviews the district court's decision not to hold a competency hearing or order a psychiatric examination for abuse of discretion, affirming the district court's decision as long as there was a sufficient evidentiary basis to support its decision. United States v. Sánchez-Ramírez, 570 F.3d 75, 80 (1st Cir. 2009) (standard of review of decision not to hold a competency hearing); Curtis, 520 F.2d at 1304 (standard of review of decision not to order psychiatric examination). To challenge a district court's finding of competency, an appellant "must present facts sufficient to positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to [her] mental competence." Brown, 669 F.3d at 17 (quoting United States v. Collins, 949 F.2d 921, 927 (7th Cir. 1991)).

Maryea argues the district court violated her due process and statutory rights by failing to order a re-evaluation of her competency to stand trial after the injuries she suffered in the January 14th car accident. Specifically, Maryea asserts that the district court erred because the accident wrought a "significant

-28-

change in circumstances" warranting an evidentiary hearing on her mental competency.

Maryea points to our decision in Johnson to support her argument stating that this case, like Johnson, involves a defendant in a criminal proceeding who was subjected to a physical injury worthy of creating a "change of circumstances." In Johnson, this court found that a competency hearing was warranted when the defendant suffered a blow to the head on the morning of the first day of trial and also lost consciousness and vomited during trial. See 249 F.3d at 23, 28. In this case, Maryea cites to the following which, she claims, created sufficient doubt as to her mental competency after the accident that should have triggered the ordering of a mental competency hearing: (1) statements she made during the January 18, 2011 Status Conference that her pain was "breaking through" her medication and that she was "damaged," "broken," and rendered incapable of participating in her own defense;[3] (2) her breakdown on the sixth day of trial when she received her medications late; (3) her "rambling, incoherent and inconsistent" testimony following the court's recess and questioning of Maryea on that sixth day following her receipt of her medication; (4) her erratic behavior on the seventh day of trial when, in response to the court's question concerning how she

_____

[3] At this Status Conference and based on Maryea's representations, the district court granted Maryea's request for a continuance.

-29-

was feeling, she stated that she was "celestial" and objected to her own counsel while attempting to address the court directly and through a subsequent pro se motion for a mistrial; and (5) Dr. Drogin's testimony as to the nature of Maryea's mental diagnosis as "bipolar with psychotic features," and which provided the court with descriptions of the disorder that she was exhibiting at trial. Based on these incidents, Maryea argues that sufficient doubt was raised as to her competency, and "only a trained expert could have accurately assessed her competency to continue."

The government rejects these arguments, contending that the district court was not required to order a second competency evaluation for Maryea. First, the government argues that Maryea's post-accident behavior was not materially different from her pre-trial behavior, particularly with respect to her speech patterns, unusual use of vocabulary, disagreements with her defense counsel and filing of pro se motions. Second, the government asserts that the district court was on notice as to Maryea's bipolar disorder and physical pain, and sufficiently reviewed the issue of the impact of physical pain on her psychological state on multiple occasions, namely during: (1) Maryea's motions for bail; (2) its order for a mental competency review; (3) its order for a medical examination following the accident; and (4) its direct evaluations and colloquies with Maryea on January 24 and 25, when it ordered additional delays to accommodate her need for medication and

-30-

proceeded only after she was questioned and evaluated. The government also contests Maryea's arguments that the testimony of the clinical psychologist at trial should have alerted the district court to doubt Maryea's competency, arguing that his testimony was consistent with the mental competency report which indicated that it would be unusual for physical pain to make a person incompetent as long as their mental disorder was reasonably under control.

Finally, the government distinguishes this case from Johnson, noting that the district court in this case did not continue the trial following the defendant's injury. Rather, the court stopped the proceedings and only continued when Maryea had received her medication, had been treated, and the court was convinced that she was competent. The government likens this case instead to United States v. Sánchez-Ramírez where the defendant was found competent to stand trial prior to its commencement, then suffered a breakdown before closing arguments due to his failure to take prescribed medications. See 570 F.3d at 79. In Sánchez-Ramírez, this court found no abuse of discretion when the district court did not conduct another competency hearing since the court relied on the fact that the defendant had already been found competent by experts, a defense motion for a competency hearing was not renewed -- suggesting that the reasons that gave rise to the motion were temporary -- and the district court was able to rely on its own observations of the defendant. Id. at 80-81.

The court agrees with the government that there was no abuse of discretion here. A close look at the record indicates that the district court had a sufficient evidentiary basis to support its decision not to order a second mental competency evaluation. Maryea was originally found competent to stand trial, and the district court's competency determination was neither objected to nor appealed. The district court's order for a medical examination and subsequent questioning of Maryea following the accident was thorough, and she made clear and coherent statements about her desire and ability to move forward with the trial. Maryea's behavior following the accident as well as her behavior subsequent to receipt of her medication on January 25 was not demonstrably different than her behavior prior to the accident. Additionally, the psychologist's testimony regarding her bipolar disorder, while revealing details about certain aspects of her psychological condition, did not contradict the competency report's conclusions that, with adequate treatment and medication, Maryea's experience of physical pain would not interfere with her competency.

First, while the record does not end with the district court's initial competency determination, it is critical to note that that the initial competency evaluation ordered by the court on September 13, 2010, explicitly requested a "medical and psychological evaluation to determine her competency to stand

-32-

trial, including an assessment of whether, and [] the extent to which her physical pain impacts that competency."  It is thus clear that the district court was aware and sensitive to the fact, early on in the proceedings, that Maryea's physical pain could impact her mental state.  The district court's finding of competency relied on the psychiatric report submitted by Dr. Drukteinis on November 10, 2010, and after the court ordered the parties to request any relief based on said report and found Maryea competent to stand trial, neither party objected nor appealed that determination.

Second, within days of the accident, the district court granted Maryea's motion to continue filed immediately after the accident and ordered that Maryea

> undergo an independent medical examination as soon as possible (preferably within the next 24 hours, if feasible) to further evaluate and diagnose any injuries she may have sustained in the recent automobile accident and to determine whether the continuing effects of those injuries, if any, will prevent her from meaningfully participating in the ongoing criminal trial and assisting in her defense, including observing the evidence and communicating with her counsel.  A report by the doctor who conducts the medical examination shall be filed with this court as soon as possible. . . .

The district court also ordered that an MRI be conducted. Additionally, it appears from the record that Maryea's pain was acutely experienced due to failure to take her medications, and upon hearing of said pain, the court ordered a recess until her medications took effect.  During the Status Conference conducted

following Maryea's taking of the medication, the court addressed the issue of her pain and engaged in a colloquy with her to affirm her ability to respond to questions intelligently. Not only did Maryea indicate her desire to proceed, but she demonstrated her ability to follow the court's line of questioning, to understand said questioning, to converse and interact with her attorney, and to provide coherent responses regarding her rights. See, e.g., Cody v. United States, 249 F.3d 47, 53 n.5 (1st Cir. 2001) (stating that the court's observation of the defendant's "appearance and demeanor as he answered questions throughout the colloquy" supported the court's competency determination) (citing United States v. Savinon-Acosta, 232 F.3d 265, 269 (1st Cir. 2000) ("Courts have commonly relied on the defendant's own assurance . . . that the defendant's mind is clear. Further, the defendant's own performance in the course of a colloquy may confirm . . . his assurances.") (citation omitted)). In addition, following the accident, Defense counsel did not file a motion for a competency hearing, suggesting that the issues which gave rise to any competency concern were temporary in nature. See Sánchez-Ramírez, 570 F.3d at 81.

Third, it does not appear from the record that, following Maryea's receipt of her proper medications, her behavior in court as it related to her defense was any different from her behavior prior to the accident. Specifically, transcripts from Maryea's

-34-

pre-trial hearings reveal that Maryea complained about her neck and back pain while also using unusual vocabulary in her oral and written statements to the court. In fact, the psychiatric report explicitly noted Maryea's evasiveness, tendency to speak in generalities, and her variable moods. However, the report nevertheless stated that it "would be a very unusual circumstance that, with an individual's mental disorder under reasonable control, the mere presence of pain would make them not competent to stand trial." That Maryea's post-medication behavior appears consistent with her behavior prior to the accident is another factor supporting the conclusion that there was no abuse of discretion in the court's decision not to order a second competency evaluation.

Finally, the district court did not err in failing to "diagnose" Maryea's courtroom behavior as identical to those characteristics of bipolar disorder flagged in the psychiatrist's evaluations of Maryea. As we just stated, following Maryea's medication for her extreme pain, the record does not show that Maryea conducted herself in a manner distinct from her behavior before the accident. Additionally, the psychiatrist's evaluation of Maryea did not contradict the court's later determination of Maryea's competency following the accident since his report stated that Maryea's experience of physical pain need not interfere with her mental competency so long as her disorder was under reasonable

control.  The court's observations on the record and the record itself indicate that Maryea had reasonable control over her mental faculties after her pain medication had time to take effect.

To conclude, this court finds that the district court had a sufficient evidentiary basis when it failed to <u>sua</u> <u>sponte</u> order a second competency evaluation.  The facts of this case and the trial court's response to Maryea were almost identical to the facts and court's response in <u>Sánchez-Ramírez</u>, where no abuse of discretion was found by this court when a defendant had been originally found competent, an expert report confirmed that competency, no motion for a competency hearing was renewed following the change of circumstances, and the district court judge made observations on the record that there were no signs of mental impairment.  <u>Sánchez-Ramírez</u>, 570 F.3d at 81.

### 3.  Prejudicial Variance

To sustain a conviction for conspiracy, the evidence must show that: (1) a conspiracy existed; (2) the defendant had knowledge of the conspiracy; and (3) the defendant knowingly and voluntarily participated in the conspiracy.  <u>United States</u> v. <u>Dellosantos</u>, 649 F.3d 109, 116 (1st Cir. 2011).  In proving the third element, the evidence must establish that the defendant both intended to join the conspiracy charged and intended to effectuate the objects of that conspiracy.  <u>Id.</u>

A prejudicial variance occurs when "(1) the facts proved at trial differ from those alleged in the indictment; and (2) the error affects the defendant's substantive rights . . . . A claim that the Government's proof varied impermissibly from the charges contained in the indictment is essentially a challenge to the sufficiency of the evidence." United States v. Dunbar, 553 F.3d 48, 61 (1st Cir. 2009) (citation omitted). In assessing a claim of prejudicial variance, the court first examines "the evidence -- direct and circumstantial -- as well as all plausible inferences drawn therefrom, in the light most favorable to the verdict, and determine[s] whether a rational fact finder could conclude beyond a reasonable doubt that the defendant committed the charged crime." United States v. Niemi, 579 F.3d 123, 127 (1st Cir. 2009) (quoting United States v. Wyatt, 561 F.3d 49, 54 (1st Cir. 2009)). Factors relevant to the inquiry in the context of conspiracy charges include: "whether the alleged conspirators shared a common purpose, whether their actions demonstrated interdependency, and the extent to which participants overlapped during the life of the alleged conspiracy." United States v. Balthazard, 360 F.3d 309, 315 (1st Cir. 2004). The government need not prove that the defendant had "knowledge of every other participant, or of the details of the conspiracy, . . . but knowledge of the broader conspiracy's existence is critical." United States v. Franco-Santiago, 681 F.3d 1, 9 (1st Cir. 2012) (citations and quotation marks omitted). A

-37-

defendant cannot succeed with a sufficiency challenge "as long as a plausible reading of the record supports the jury's implied finding that [said defendant] knowingly participated in the charged conspiracy." United States v. Pérez-Ruiz, 353 F.3d 1, 7 (1st Cir. 2003).

If the court finds that the evidence is not sufficient to permit a jury to find a defendant's express or tacit agreement to the charged conspiracy, it then looks to whether the evidence was sufficient to permit a jury, under a proper set of instructions, to convict the defendant of a related, similar conspiracy. United States v. Candelaria-Silva, 166 F.3d 19, 39 (1st Cir. 1999). If the defendant could be convicted of a related, similar conspiracy, the court then asks whether the variance between the indictment and the conspiracy proven at trial affected the defendant's substantial rights or if the difference amounted to harmless error. Id.

Since Maryea preserved this issue through her objections at trial, de novo review is appropriate. United States v. DeCicco, 439 F.3d 36, 43-44 (1st Cir. 2006).

Maryea asserts that, because nearly all of the evidence introduced at trial pertained to the Muder rather than the Woods conspiracy, there was an impermissible variance between the charge in the Superseding Indictment and the evidence introduced at trial. Therefore, Maryea claims, her conviction was not supported by

sufficient evidence and the district court erred in denying her Rule 29 motion for judgment of acquittal.

In support of her argument, Maryea cites to this court's decision in Dellosantos. In that case, the two defendants convicted at trial had been part of an eighteen-defendant superseding indictment that charged all defendants with joining an overarching conspiracy to distribute both cocaine and marijuana in Maine. Dellosantos, 649 F.3d at 110-11. On appeal, this court found that there was insufficient evidence to support the finding of a single conspiracy, and instead found two separate conspiracies: a Massachusetts-based conspiracy to distribute cocaine only, and a Maine-based conspiracy to distribute both cocaine and marijuana. Id. at 119. Here, Maryea maintains, the government submitted evidence of a single, overarching conspiracy, headed by Muder, to smuggle controlled substances into RCHOC, but the government did not present sufficient evidence that Maryea knowingly and voluntarily joined the separate and distinct charged conspiracy involving Woods, Durham, and the smuggling of Suboxone.

Maryea goes on to assert that she was unfairly prejudiced by this variance in two ways: (1) inadequate notice of the charges against her; and (2) prejudicial "evidentiary spillover." Regarding notice, Maryea claims that, since the Superseding Indictment named only Maryea and Woods, it put her on notice of "the smaller, less sophisticated Woods conspiracy, when the

-39-

government actually put Maryea on trial for the larger, more complex Muder conspiracy." With respect to "evidentiary spillover," Maryea contends that she was prejudiced by the transference of guilt to her from evidence incriminating defendants who participated in another conspiracy in which she was not involved. Specifically, Maryea asserts that all of the evidence introduced at trial concerned the Muder conspiracy, and the only evidence relating to the Woods conspiracy was Durham's testimony and three calls between Durham and Woods in July 2009.

The government maintains that the evidence presented at trial supported the jury's verdict that she was part of the conspiracy charged in the Superseding Indictment. Specifically, it contends that there was no variance since there was "ample evidence to permit the jury to conclude that, as charged in [said] indictment, from April 2009 to September 20, 2009, there was an ongoing conspiracy to smuggle controlled substances into the Rockingham Jail, which the defendant joined with a full understanding of the overall criminal objective." The government states that an agreement in the conspiracy was reached when Durham contacted Maryea as instructed by Woods to get her assistance in continuing to smuggle Suboxone into the prison. After meeting with Durham multiple times to get the Suboxone, Maryea arranged for the Suboxone to be packaged "with the Oxycodone that she was already smuggling for Muder and for all these drugs to be brought to the

-40-

nursing home together so that they could then be transported into the jail by the trustees. This continued until law enforcement intervened on September 20, 2009, thereby ending the conspiracy.

The government further argues that this case is distinguishable from Dellosantos since Maryea knew about Woods' agreement with Durham to distribute drugs in the jail and decided to join the endeavor, combining it with her ongoing efforts to smuggle other controlled substances into the jail for Muder. Thus, unlike the defendants in Dellosantos -- defendants who were found to be indifferent to the drug distribution in the first conspiracy and did not even know that the conspiracy existed for most of the relevant time period -- Maryea had direct contact with Durham concerning the Suboxone smuggling and participated in the agreement between Woods and Muder to smuggle said Suboxone into RCHOC.

In the alternative, the government argues that, if the court finds that a variance existed, it was not prejudicial to Maryea. This is because the Woods conspiracy was similar to the broader conspiracy charged "insofar as it involved the defendant agreeing with Woods and others to possess with intent to distribute illegal drugs, including Suboxone and Oxycodone." Maryea had notice, according to the government, since the Superseding Indictment charged her with reaching an agreement that ran until September 20, 2009, the day that Knowles was arrested for dropping Suboxone and Oxycodone at the jail. Further, the Superseding

Indictment identified not only Suboxone, but also Oxycodone and other drugs involved in the conspiracy. The government maintains that Maryea demonstrated her notice at trial when she identified her defense theory as one in which she intended to blame Muder by showing that she was either under duress or did not have the requisite mental state due to her desire to placate him.

Finally, the government rejects Maryea's arguments regarding "evidentiary spillover" since "the bulk of the government's case related to the August-September 2009 time frame rather than the April-July time frame." Specifically, the government contends that, even if two conspiracies were proven -- one between Woods and Durham and one between Maryea, Woods, Muder and others -- Maryea was not prejudiced by the admission of evidence about the "April through July conspiracy" since it was clear on the record that Maryea did not know about Durham's smuggling arrangement with Woods at that time. Therefore, the government argues, Maryea cannot claim that she was convicted because of the admission of "incompetent proof about the April-July conspiracy involving Woods and Durham, since it was obvious to the jury that the defendant's first dealings with Woods and Durham were not until later."

In this case, in order to find that a single conspiracy was charged, it must have been possible for the jury to "infer from the acts and statements of the witnesses a single ongoing

'agreement' that embraced [Maryea] and other co-conspirators." United States v. Jones, 674 F.3d 88, 92 (1st Cir. 2012). We find that it was more than possible for the jury to so infer.

First, the evidence shows that the activities that took place between Maryea, Woods and Durham were in fact linked to the Muder conspiracy's larger operation of smuggling controlled substances into RCHOC. Co-conspirators Knowles, Noonan and Bowley testified at trial about the details of the Muder conspiracy's drug smuggling operation into RCHOC, including the use of trustees to smuggle drugs through slugs left at the nursing home adjacent to the prison. The government then presented recorded telephone conversations between Maryea and Muder indicating delivery arrangements for the drugs. The government also presented recorded telephone conversations between Woods and Durham where Woods indicated he was looking for Suboxone, and on August 14, 2009, Woods gave Durham Maryea's number and directed her to contact Maryea because he "owe[d] her boy." In Durham's testimony at trial, she stated that she not only spoke with Maryea "a few, five, ten" times, but also gave her Suboxone with the understanding that "[t]hey were going to end up [in the jail]" to Woods, and that, if the Suboxone made it in, it was her understanding that Woods "would give [Maryea's] boyfriend [Muder] a split of [it]." She also testified that she met Maryea at her home when co-conspirator Knowles was present and gave her Suboxones for Woods. Finally,

-43-

Durham stated that she got confirmation from Woods that the Suboxone had made it into the prison. That confirmation was reinforced at trial by Durham's explanation of recorded telephone conversations played before the jury in which she and Woods discussed the Suboxone amounts that Woods had received. Therefore, Durham's testimony indicates that, while the Woods distribution operation in part ran separately from Muder's, Woods relied on Durham and Maryea to procure the Suboxone and incorporate its distribution into Muder's drug-smuggling operation. The government also presented evidence of the drugs seized from Knowles and Noonan upon their arrest at the nursing home, including slugs containing Xanax, Oxycodone and Suboxone.

This evidence, coupled with the actual conspiracy charged in the Superseding Indictment, is sufficient for a jury to infer a single conspiracy involving the smuggling of controlled substances into RCHOC. The conspiracy charged extended between April 2009 and September 20, 2009, included Maryea's agreement with Woods and others -- namely, "other persons both known and unknown to the grand jury" -- to possess with intent to distribute and to unlawfully distribute Suboxone as well as Oxycodone, Oxycontin, Lorazepam, and Ativan. We therefore find that a common goal can be discerned between the Muder and Woods conspiracies. Under our law, the common goal requirement has "wide breadth," and may be easily found here where both conspiracies involved possession with intent

-44-

to distribute and distribution of controlled substances into RCHOC. See United States v. Sánchez-Badillo, 540 F.3d 24, 29 (1st Cir. 2008) (citation omitted).

Second, Maryea herself embodies the overlap among the activities' participants. Even if she did not participate at the beginning of Woods and Durham's Suboxone-smuggling conspiracy, she joined it later to combine their efforts with the efforts of the Muder narcotics-smuggling operation. See United States v. Bello-Pérez, 977 F.2d 664, 668 (1st Cir. 1992) (to determine whether a defendant participated in the conspiracy, it is not necessary for the jury to find that the alleged co-conspirators joined the conspiracy at the same time or shared knowledge beyond a tacit understanding that their illicit agreement existed, and it is further not required that all participants knew each co-conspirator or that each co-conspirator participated at the same time in furtherance of the criminal venture; rather, what is essential is that the criminal goal or overall plan "have persisted without fundamental alteration, notwithstanding variations in personnel and their roles.").

Third, there was an interdependence among the participants of the Woods and Muder conspiracies. "Establishing interdependence among the participants requires determining whether the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme."

Sánchez-Badillo, 540 F.3d at 29 (quoting United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999)).  This interdependence "makes it reasonable to speak of a tacit understanding between [a core conspirator] and others upon whose unlawful acts" his success depends.  Id. (quoting United States v. Glenn, 828 F.2d 855, 858 (1st Cir. 1987)).  Based on the evidence presented at trial -- Durham's testimony, the recorded telephone conversations, and the Suboxone found with other controlled substances in the slugs seized upon Knowles and Noonan's arrests -- a jury could rationally infer that Woods' drug-smuggling operation was orchestrated through the same means as the Muder operation and that Woods' Suboxone supply depended, at least in part, upon Maryea's successful procurement and distribution of the substance to RCHOC through Muder's channels.  See United States v. Soto-Beníquez, 356 F.3d 1, 19 (1st Cir. 2003) (interdependency may be shown where "the success of an individual's own drug transactions depends on the health and success of the drug trafficking network that supplies him").[4]

Having found that a jury could have reasonably concluded that the Durham-Maryea-Woods activities shared a common purpose

---

[4]  Since we do not find that the evidence established an agreement different from that charged, we need not address the issue of variance.  United States v. Soto-Beníquez, 356 F.3d at 18 n.1 (stating that the Court need not reach the issue of variance "because we find sufficient evidence to support the finding of a single conspiracy.").  We also need not reach the issue of whether Maryea was prejudiced by any variance in our analysis.  See id.; Pérez-Ruiz, 353 F.3d at 7.

with Muder's drug-smuggling operation, had the requisite degree of interdependency, and were a portion or component of Muder's larger conspiracy, we cannot agree with Maryea's argument that a variance existed with respect to the conspiracy charged and the conspiracy proven.

## III.  Conclusion

We conclude that the district court did not err in denying Maryea's motion to dismiss on Speedy Trial Act grounds, nor did the district court commit an abuse of discretion by not ordering a second mental health evaluation of Maryea's competency. We further conclude that the government's proof at trial did not establish an impermissible variance that would warrant reversal of Maryea's conviction.  Accordingly, the judgment of the district court as to Maryea is affirmed.

**Affirmed**.